### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### MONROE AUTO EQUIPMENT CO., Respondent.

#### No. 18339.

United States Court of Appeals
Eighth Circuit.

Nov. 29, 1966.

---

Elliott C. Lichtman, Atty., N. L. R. B., for petitioner; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Herman M. Levy and Elliott C. Lichtman, Attys., N. L. R. B., were on the brief.

Jerome Schur, Chicago, Ill., for intervenor International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO; Messrs. Harold A. Katz, Irving M. Friedman and Glenn P. Schwartz, Chicago, Ill., were with him on the brief.

John E. Tate, of Nelson, Harding, Acklie, Leonard & Tate, Lincoln, Neb., for respondent; William P. Trusdale, Deines & Trusdale, Cozad, Neb., was with him on the brief.

Before VOGEL, Chief Judge, MATTHES, Circuit Judge, and DUNCAN, Senior District Judge.

DUNCAN, Senior District Judge.

This case is before the court on a petition of the National Labor Relations Board pursuant to Section 10(e) of the National Labor Relations Act, as amended, 61 Stat. 136, 29 U.S.C. Section 151 et seq., for enforcement of its order issued against the Respondent, Monroe Auto Equipment Co., on June 30, 1965. The Board's decision and order are reported in 153 N.L.R.B. 69.

This Court has jurisdiction under Section 10(e) of the Act, the unfair labor practices having occurred at Cozad, Nebraska, where the company is engaged in the manufacture, reconditioning, and wholesale distribution of automobile shock absorbers.

The Board found that the Company violated Sections 8(a) (1) and 8(a) (3) of the Act by discharging employee, Burton Slack, because of his union activities. The Board further found that Company supervisors, by certain remarks and other conduct, interfered with, restrained and coerced employees in their exercise of rights guaranteed by Section 7 of the Act, in violation of Section 8(a) (1).

The International Union of Automotive, Aerospace and Agricultural Implement Workers of America, AFL–CIO, began its organizational efforts at the Company plant, at Cozad, Nebraska, in 1963. In a previous case, reported at 146 N.L.R.B. 1267, the Board found that the Company, at that time, was guilty of violating Section 8(a) (1) of the Act by engaging in an anti-union campaign. The Union's attempt to organize, at that time, was unsuccessful.

The Board's findings, in the present instance, were based upon circumstances which occurred during the months of April, May, and June, 1964.

The dischargee, Burton Slack, had been an employee of the Company since January, 1962. He was discharged on June 4, 1964. It is clear that he was an early supporter of the Union's organizational efforts at the plant and was a member of the plant organizing committee prior to the 1963 election. It is also clear that Slack's propensity toward unionization was well known to the Company management and supervisors. In fact, on May 1, 1964, when the Regional Director held a hearing on the Union's petition for a representation election, Slack and a coworker, Keith Schmit, appeared on the podium with the Union representatives throughout the proceedings.

At this time, Slack's foreman was Ollie Goa, quality control manager at the plant. Galen Gengenbach, an inspector in Goa's department, testified that on the morning after the aforesaid meeting, foreman Goa commented to him that "both Keith Schmit and Burt Slack, who were representing or supporters of the United Auto Workers, thought they were pretty smart sitting down there with the other union men and (that) he felt like getting up and busting both Keith Schmit and Burt Slack." Gengenbach further testified that during the last week in May, foreman Goa warned him about associating with Slack, admonishing him that "I was a good man and that I shouldn't associate with a no-good union … … …."

Gengenbach also testified that a foreman's desk was located about 25 feet from the area where Slack normally worked. He stated that prior to the aforesaid union meeting of May 1, foreman Goa and plant superintendent Smith came to this location only once or twice an hour, and, then, for only short periods of time.

Slack testified that this practice abruptly changed after the aforesaid meeting, and that during the month of May, and until June 4, when he was discharged, Goa and Smith spent long periods of time at this desk each day, thereby keeping him under almost constant surveillance. Goa denied that his practice, in this connection, varied at all, subsequent to the May 1 union meeting.

Joseph Schenk, who was employed by the Company as an assistant quality control manager from October, 1961, to April, 1964, (prior to the union meeting of May 1, 1964 and Slack's discharge,

which occurred on June 4, 1964) gave the following testimony regarding a conversation which occurred at a gathering of some of the plant supervisors, during the last week of March, 1964:

" * * * Gene Peterson and Wayne Fyfe (Company foreman) were talking, one just about as much as the other, about the meeting they had held that day with Mr. Tate in the office, and they were supposed to relay the message to the night foreman and the night superintendent, and in the course of the meeting, Wayne Fyfe and Peterson said that Mr. Tate had said that we were supposed to ignore all union employees as much as possible, just don't pay any attention to them unless it was strictly business. He also said that there would never be an election in the Monroe Auto Equipment Company for two reasons, one that as they posted notice of the election, they would go right down the line and start firing union employees, for instance, Burt Slack and Keith Schmit, Bill Kuefelt. That way the UAW would file charges against the company and that would hold the election off again and we would go through this rigmarole that we did the time before, which meant nothing, or if the UAW didn't file charges, it would scare the people so bad knowing that Burt and Keith and the other fellows got discharged for union activities, they would be afraid they would get discharged for union activity and they would vote the opposite of what they would vote in the first place."

There are several assembly lines in the plant, each about 300 feet long. Approximately 150 people work on each line, and each has an inspector, whose duty it is to inspect certain tubes before they are placed on the product, at the proper point on the line. Slack was employed as an inspector on one of these lines, and, as heretofore stated, Goa was his supervisor, on the day he was discharged.

On the morning of June 4, 1964, the day of Slack's discharge, operations began, as usual, at 7:00 A.M. At about 8:00 A.M., Slack told his co-worker, Gengenbach, that he was going to leave his line for a few minutes in order to get a doughnut and carton of milk in another part of the plant.

Slack testified that as he was returning to his work station, 5 to 7 minutes later, Goa saw him and called out: "Get the hell down here on the line". When he reached his work station, Slack continued, a material handler gave him a tube to inspect and measure. As he began to do this, Slack stated that Goa returned to the scene and vulgarly declared to him: "Keep your ...... down here on the line. You got all the line shut down." However, Slack testified that, in fact, the line had not shut down, at that time, because of his absence from his work station. When he ascertained this, Slack continued, he said, "Oh b. s." Goa then asked what Slack had said, and Slack repeated this vulgarity. Goa then instructed Slack to come with him and "punch out", and, concluded the encounter, according to Slack, by stating, "I don't have to take b. s. off anybody like you". This version of the encounter between Slack and Goa was corroborated substantially by two other witnesses called on behalf of the General Counsel.

Goa was the only witness called in behalf of the Respondent. He testified that plant manager Fisk had issued instructions to the Company supervisors to stay away from "union pushers" and not get involved with them because the impending union election might be put off.

In connection with the foregoing encounter with Slack, Goa testified that on the morning of June 4, he was in supervisor Fisk's office when Fisk received a phone call from production relating that the assembly line was down and that the inspector (Slack) was not in the area. Upon instruction from Fisk, Goa started toward the production area to find out why the line was down. On the way, he encountered Slack, who had a doughnut and carton of milk in his hand talking to a group of men. Goa testified that he told Slack that he could not leave the production area and had to keep the line

going. When he started to walk away, Goa testified that Slack said, "b. s.", and when asked by Goa what he said, he repeated the expression. The following exchange then took place, according to Goa:

Goa: "I don't have to take that talk off you."

Slack: "What are you going to do about it?"

Goa: "You are fired".

Slack: "B. S."

Goa: "Come with me."

Slack: "B. S.".

After further conversation of the same nature, Goa testified that he walked away and reported the incident to Mr. Fisk.

Prior to the foregoing encounter, the record reveals that Slack's employment with the Company had been marked by repeated derelictions of duty followed by criticism and, on at least one occasion, disciplinary action by the Company. At one time, he had been suspended for seven days for having someone else punch the time clock for him, and, on numerous other occasions, he had been reprimanded by Goa for being late to work.

In addition, there had been complaints made against Slack for loitering in areas of the plant away from his work area and talking to girls. Goa testified that Slack ceased this practice after being warned three times about it. Finally, Goa testified that, sometime prior to his discharge, Slack would often leave his work station to obtain coffee, up to seventeen times a day.

There is no testimony in the record, however, that Slack had taken part in union activities at the plant, during working hours, which, of course, he had no right to do. Nor is there evidence that any complaint was made by the Company of such activities on his part.

Upon the foregoing facts, the Board, in agreement with the Trial Examiner, concluded that the Company had violated Sections 8(a) (3) and (1) of the Act, by discharging Slack because of his union activities. In this connection, the Trial Examiner's decision, concurred in by the Board, stated:

"* * * On the basis of the foregoing findings, it is the conclusion of the Trial Examiner that, although standing by itself the comment which Slack made to his foreman on June 4 could well have served as complete justification for his peremptory dismissal, the real motive for this employee's summary discharge was not the fact that during a vulgar exchange with his foreman he made the last and more obscene remark, but rather his activities on behalf of the UAW, which activities so plainly had irked and annoyed Foreman Goa over a long period of time."

The Board further concluded that the Company interfered with, restrained and coerced employees, in violation of Section 8(a) (1) of the Act, by Goa's remarks to Gengenbach concerning Slack and Schmit's presence at the representation hearing, by Goa's warning to Gengenbach about his association with Slack, and by Goa and Smith's close surveillance of Slack following his appearance at the representation hearing.

The Board's order directs the Company to cease and desist from the unfair labor practices found, and from interfering with, restraining or coercing employees, in any other manner, in the exercise of their Section 7 rights. Affirmatively, the Company is directed to offer Slack reinstatement to his former or substantially equivalent position, and to make him whole for monies lost as a result of the found discrimination against him.

I.

The burden of proving an improper motive for discharge of an employee, for union activities, is upon the Board. N. L. R. B. v. Montgomery Ward & Co., 157 F.2d 486, 491, (8 Cir. 1946); N. L. R. B. v. Moore Dry Kiln Company, 320 F.2d 30, 32–33, (5 Cir. 1963); Lawson Milk Company v. N. L. R. B., 317 F.2d 756, 760, (6 Cir. 1963); Portable Electric Tools, Inc., v. N. L. R. B., 309 F.2d 423, 426–427 (7 Cir. 1962); Ore-Ida Potato Products, Inc., v. N. L. R. B.,

284 F.2d 542, 545–546, (9 Cir. 1960), and findings of the Board, in this connection, may not be set aside where they are supported by substantial evidence from the record considered as a whole. N. L. R. B. v. South Rambler Company, 324 F.2d 447, 449 (8 Cir. 1963); Marshfield Steel Company v. N. L. R. B., 324 F.2d 333, 335 (8 Cir. 1963); N. L. R. B. v. Morrison Cafeteria Co., of Little Rock, Inc., 311 F.2d 534, 536 (8 Cir. 1963). Such findings of the Board are thus entitled to respect, but, as the United States Supreme Court has stated:

"* * * they must nonetheless be set aside when the record before the Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." N. L. R. B. v. South Rambler, supra, 324 F.2d at 449 (Quoted from Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 490–491, 71 S.Ct. 456, 465, 466, 95 L.Ed. 456 (1951)).

Upon examination of the record in this case, it is our conclusion that the Board's finding that Slack's discharge resulted from his union activities, was based upon mere speculation and inferences which are not supported by substantial evidence in the record. The Board's petition, in this regard, must, therefore, be denied.

The evidence reveals, beyond doubt, that the Respondent had exhibited an anti-union animus prior to Slack's discharge. In fact, as heretofore stated, the Board found, in a previous instance, that the Company had violated Section 8(a) (1) of the Act, by engaging in an anti-union campaign. In addition, the evidence leaves no doubt that the Company's view of unionization efforts at the plant continued to be hostile, at the time of the discharge.

The evidence also reveals conclusively that Slack was a "union pusher" and that the Company was fully apprised of this fact. In this connection, it is clear that he was a member of the plant organizing committee prior to the 1963 election, and that, approximately one month prior to his discharge, Slack, together with Keith Schmit, another known "union pusher" in the plant, appeared on the podium with union representatives at a hearing on the union's petition for a representation election, held by the Regional Director. Beyond these facts, however, there is no tangible evidence, of any nature, which indicates that Slack was engaged in either legal or illegal union activities, prior to his discharge.

On the other hand, the record is clear to the effect that Slack's employment with the Respondent had been marked by tardiness, absence from his assigned work area, and other repeated violations of proper Company rules. He was, in short, an unsatisfactory employee, in many respects. The culmination of his recalcitrant conduct occurred, as heretofore stated, with his pronounced insubordination to his supervisor, Goa, on June 4, which event terminated immediately in his discharge. In this connection, Goa testified as follows, when asked, on cross-examination, why he discharged Slack on the day before the election:

"Because of insubordination. I don't think any guy can tell his Boss he is full of .......... and ask him what he is going to do about it and expect to not get fired."

The law is clear that "(a)n inference that a discharge of an employee was motivated by his union activity must be based upon evidence, direct or circumstantial, not upon mere suspicion * * *," N. L. R. B. v. South Rambler Company, supra, 324 F.2d at 450. See also: Osceola Co. Co-op. Cream. Ass'n v. N. L. R. B., 251 F.2d 62, 69 (8 Cir. 1958); N. L. R. B. v. Montgomery Ward & Co., supra, 157 F.2d at 491; Schwob Manufacturing Company v. N. L. R. B., 297 F.2d 864, 867 (5 Cir. 1962); N. L. R. B. v. Western Bank & Office Supply Company, 283 F.2d 603, 606 (10 Cir. 1960); and, as heretofore stated, the burden of proving an improper motive for discharge is upon the Board. Certainly, moreover, an employer may

hire and discharge at will, so long as his action is not based on opposition to union activities. N. L. R. B. v. South Rambler Company, supra, 324 F.2d at 449; Farmers Co-Operative Co. v. N. L. R. B., 208 F.2d 296, 303–304 (8 Cir. 1953); N. L. R. B. v. United Parcel Service, Inc., 317 F.2d 912, 914 (1 Cir. 1963); N. L. R. B. v. Local 294, International Bros. of Teamsters etc., 317 F.2d 746, 749 (2 Cir. 1963).

In the present instance, it is our conclusion that "mere suspicion" of improper motive on the part of the Respondent, in discharging Slack, because he was a known "union pusher", together with the fact of Respondent's anti-union animus furnishes the only basis in the record for the Board's finding of improper discharge, and, as stated above, "mere suspicion" of improper motive is insufficient for this purpose.

Beyond this, we find the record to be completely devoid of evidence, direct or circumstantial, which justifies such a conclusion. Balanced against these factors, and controlling, in our opinion, is the fact of Slack's repeated violations of proper Company rules, his pronounced insubordination to supervisor, Goa, which immediately precipitated his discharge, and the fact that Schmit, another known "union pusher" was not discharged at this time, which, admittedly, was the day before the union election.

In view of this evidence, we feel that the Board's conclusion of improper discharge is not supported by substantial evidence from the record considered as a whole, and is, therefore, in error.

In reaching this decision, we are cognizant of the rule that " * * * a justifiable ground for dismissal of an employee is no defense to an unfair labor charge if such ground was a pretext and not the moving cause." N. L. R. B. v. South Rambler Company, supra, 324 F. 2d at 449; Osceola Co. Co-op. Cream. Ass'n v. N. L. R. B., supra, 251 F.2d at 66; N. L. R. B. v. Solo Cup Company, 237 F.2d 521, 525 (8 Cir. 1956); N. L. R. B. v. Mayrath Company, 319 F.2d 424, 427 (7 Cir. 1963).

However, we feel that the well settled doctrine that, "(a)n employer's general hostility to unions, without more, does not supply an unlawful motive as to a specific discharge", N. L. R. B. v. South Rambler Company, supra, 324 F. 2d at 449, 450, is determinative of this issue, in the present instance. See also: N. L. R. B. v. Atlanta Coca-Cola Bottling Company, 293 F.2d 300, 304 (5 Cir. 1961), rehearing denied 296 F.2d 896 (1961); Ore-Ida Potato Products, Inc., v. N. L. R. B., supra, 284 F.2d at 545–546; N. L. R. B. v. Redwing Carriers, Inc., 284 F.2d 397, 402 (5 Cir. 1960).

II.

It is our further conclusion, based upon the above facts, that there is substantial evidence supporting the Board's conclusion that the Company interfered with, restrained and coerced employees, in violation of Section 8(a) (1) of the Act, by Goa's remarks to Gengenbach concerning Slack and Schmit's presence at the representation hearing, and by Goa's warning to Gengenbach about his association with Slack.

However, we do not agree with the Board's finding of a further 8(a) (1) violation by Goa and his assistant foreman's close surveillance of Slack, following his appearance at the representation hearing. As stated above, this alleged surveillance occurred when these foremen sat at a desk near Slack's work area. Goa explained his presence at the desk, in the following way:

"I like to use it when I check the whole line. I will sit there at the desk and in this sense I can see conveyor A and can look at the other end of the plant which is where they put the dirt shield on. In other words, it is a good place to sit. I can check on all my boys and make sure there is no trouble and everything is running smoothly."

In light of this testimony, we do not see how the foremen's use of the desk, where they had a perfect right to be, can be properly regarded as a violation of Section 8(a) (1) of the Act.

Accordingly, the petition of the Board for enforcement of its order will be granted, except as to the discharge of employee, Slack, and the found "surveillance" violation, as discussed above.