NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

RED TOP, INC., Respondent.

No. 71–1228.

United States Court of Appeals,
Eighth Circuit.

Feb. 1, 1972.

**722**

Judith P. Wilkenfeld, Atty., Eugene G. Goslee, Acting Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Herman M. Levy, Atty., N.L.R.B., Washington, D. C., for petitioner.

Thomas M. Hanna, St. Louis, Mo., for Red Top, Inc.; McMahon & Berger, St. Louis, Mo., of counsel.

Before GIBSON, BRIGHT and ROSS, Circuit Judges.

GIBSON, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order[1] against Red Top, Inc., for § 8(a) (1) (29 U.S.C. § 158(a) (1)) violations in discharging certain employees. The Board found that respondent Red Top had violated § 8(a) (1) by discharging three employees, Delwin Svoboda, Carl Tyler and James Walton, and by refusing to reinstate another employee, James Barr, and thus terminating his employment. Red Top defended on the ground that the discharges were for cause and that Barr had quit. The Board ordered reinstatement and further that the employees be made whole for any loss of earnings during the period.

Red Top is a Nebraska corporation, with its principal office in Denver, Colorado. It is in the business of providing housekeeping or janitorial services to hospitals in various states. Archbishop Bergan Mercy Hospital in Omaha, Nebraska, is one of its customers and is the location of the unfair labor practice complaint in this case. The housekeeping operations there are performed by separate day and night shifts. An Advisory Committee is elected by each shift to represent the employees in any dispute with management which the employee is unable or unwilling to settle directly with management. The Advisory Committee for the night shift during the time in question of January to May 1969 was composed of Delwyn Svoboda, Chairman, Carl Tyler, Co-Chairman, James Walton, Secretary, James Barr, Treasurer, and Grover Henderson, Alternate.[2]

Beginning in January 1969 the Advisory Committee made numerous complaints about Red Top's local manager and appeared to be unduly disturbed

---

1. The Board's Decision and Order are reported at 185 N.L.R.B. No. 138.

2. The Trial Examiner found the Advisory Committee to be a labor organization within the meaning of the Act and this finding is accepted by the parties.

when an unannounced inspection in mid-January of 1969 found the Hospital to be "in general dirty shape [and] especially the area served by the night staff." As a result of this inspection the employment of the night supervisor, Vern Hawkins, was terminated. A complaint was then made by the Advisory Committee about Red Top's local management of misusing funds, firing employees without consulting the Advisory Committee, lack of promotion from the ranks and the hiring of new personnel. In response to this complaint Denne of the home office flew to Omaha and met with the Committee on February 26. Local grievances were discussed and Denne specifically instructed the Committee members to deal first with Red Top's local management before contacting the head office. The local manager, Florian, was replaced on March 15, by Lassiter. Lassiter continued to insist on more competent cleaning practices and gave some demerits to Walton because his area had been found "cruddy." Walton responded by banging his fist on a chair and on Lassiter's desk and denied the "cruddy" charge. Walton was discharged for insolence on this occasion but reinstated after an apology two days later as recommended by the Advisory Committee. In the meantime Svoboda sent another notice to President Williams in Denver as follows: "Contact the Advisory Committee chairman in Omaha Bergan Mercy Hospital." As a result of this telegram Denne called Svoboda from Denver, asked what the problems were and criticized Svoboda for going over Lassiter's head despite the express instruction to take the problems up with Lassiter first.

On April 17, the Advisory Committee sent a letter to President Williams' attention requesting a meeting on or before April 25, stating it was unable to communicate with local management (Lassiter). Later, on April 21, Tyler told Lassiter to notify Denne by telephone to be in Omaha by April 25 or the Committee would take its complaints directly to the hospital administration. Denne made a conciliatory answer to the April 17 letter but noted the Committee's failure to refer to specific cases, and urged the Committee to prepare a list of grievances and take them up with Lassiter; further, that he would review them with the Committee when he was in Omaha and again urged the Committee to take up their problems with Lassiter.

A meeting with Lassiter was held on April 23, at which time the Committee complained about Supervisor Hawkins' discharge in January and about an employee, Hernandez, discharged in March. Tyler said it was a good thing that Hernandez had not come back to the hospital because if he had he would have attacked Lassiter. Tyler also said that Lassiter's description of Walton's work area as "cruddy" could result in Lassiter's being attacked by Walton. When Tyler made this statement Walton shook his head in an affirmative fashion and smiled. Tyler denied making the statement, but, the Trial Examiner credited Lassiter's testimony.

The Trial Examiner, based on his personal observation of the demeanor of the witnesses and the inherent credibility of their testimony, generally credited the testimony of Red Top's witnesses over that of the General Counsel.[3] The Trial

---

3. The Trial Examiner said:
"Indeed, I have the distinct impression that both Svoboda and Tyler looked upon their appearance as witnesses for the General Counsel as presenting a golden opportunity to vent their spleen against Lassiter and that this misconception of their role as witnesses accounts in part for the unreliability of their testimony as herein described in greater detail * * *."

"Not only because of the retraction Tyler made of his similar denial concerning the Hernandez threat, but also because his testimony is in various respect [sic] confusing, uncertain, hesitant, etc., and because his demeanor made an unfavorable impression on me, I consider Tyler a generally untrustworthy witness on important points of fact."

Examiner found that the discharge of employees Svoboda, Walton, and Tyler, on April 29 was because of their aggravated and insolent conduct towards Lassiter and their failure to give due regard for the interest of their employer in threatening to make complaints and making complaints to the employer's customer, the Hospital.

The Trial Examiner also found that the course of conduct engaged in by the three discharged employees was for the purpose of securing the removal of Lassiter from the manager's post and installation of a more satisfactory replacement. He found:

"Indeed, as I view the record and as Respondent contends, the committee set out, from the time of Lassiter's promotion to the manager post, on an intensive and multiform program of harassment, the objective of which was to bring Lassiter down and somehow to install a manager of their liking, and which as its method of operation involved attacks of all sorts on Lassiter and other actions of the kind previously described. Plainly these tactics were designed to and did undermine Lassiter's authority as manager to such a degree as to require Respondent, clearly faced with the prospect of their continuation, to decide whether it would be Lassiter or the offending committee members who would remain in its employ at the hospital."

The Trial Examiner further found that the discharge of Barr for engaging in a sympathy walkout because of the firing of Svoboda, Walton, and Tyler was in violation of the employee's right to engage in "protected concerted activity" under § 7 and held that Barr was entitled to reinstatement upon request.

A three-member panel of the Board reviewed the Trial Examiner's findings,

found no prejudicial error was committed, affirmed his rulings and adopted his findings, conclusions and recommendations but as modified by the Board's conclusion that the discharge of employees, Walton, Tyler and Svoboda, was based upon their concerted protected activities on behalf of the Advisory Committee. The Board viewed the issue as whether or not "the discriminatees engaged in such flagrant acts during their conversation with management that would justify their discharge" and properly pointed out that not any impropriety committed in the course of § 7 activity deprives the employee of the protective mantle of the Act, citing Bettcher Mfg. Co., 76 N.L.R.B. 526. The Board then stated the following principle, "Thus, where, as here, the improper conduct is closely intertwined with protected activity, the protection is not lost unless the impropriety is egregious." It perceived the alleged misconduct as "of a minor nature * * * the result of understandable anger in the course of disagreements over matters under discussion." Basically it viewed the discharges as "abrupt" and concluded the men were discharged "because of their continuing efforts to solve their problems at the hospital or, in effect, for engaging in a concerted activity protected by section 7 of the Act, and not for insubordination as contended by the respondent." It also approved the order to reinstate employee Barr, viewing his discharge as an "unfair labor practice" striker who was entitled to reinstatement upon an unconditional application for re-employment.

■■ The findings of the Trial Examiner are not "as unassailable as a masters", Universal Camera Corp. v. NLRB, 340 U.S. 474, 492, 71 S.Ct. 456, 95 L.Ed. 456 (1951), and the Board has the final responsibility for the decision. Its findings of fact are conclusive if

"Svoboda and Tyler * * * demeanorwise made an unfavorable impression upon me. * * * In short, where there are clear contradictions as between Respondent's witnesses and those of the General Counsel concerning this meeting, I consider Respondent's witnesses the more reliable and trustworthy, as, indeed, I generally do in respect to other points of fact."

supported by substantial evidence on the record considered as a whole, 29 U.S.C. § 160(e); however, "evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion." Universal Camera Corp. v. NLRB, 340 U.S. at 496, 71 S.Ct. at 469. This is even more the case where the matter to be resolved is one which depends on the credibility of witnesses. Universal Camera Corp. v. NLRB, 340 U.S. at 494, 496, 71 S.Ct. 456.

The only facts cited to support the Board's conclusion that the employees were discharged for engaging in protected activities are (1) that the discharges were "abrupt" and (2) that they occurred "soon after" a letter had been sent to the home office complaining about the local management. No effort was made by the Board to explain the reasons for rejecting the finding of the Trial Examiner that the employees were not engaged in a protected activity but in a conspiracy to undermine the local manager, a finding of fact of intent based on credibility and demeanor; nor does the General Counsel's brief give us any assistance. Searching the record, and giving due weight to the Examiner's findings on credibility, we find nothing in the record that would indicate that the intent of the three employees was other than as found by the Trial Examiner.

■ While, "a justifiable ground for dismissal of an employee is no defense to an unfair labor charge if such ground was a pretext and not the moving cause," NLRB v. South Rambler Co., 324 F.2d 447, 449 (8th Cir. 1963); accord, NLRB v. Monroe Auto Equipment Co., 368 F.2d 975 (8th Cir. 1966), the inference that the discharge was motivated by participation in activities protected by the Act must be based on evidence, direct or circumstantial, and not upon mere suspicion. NLRB v. South Rambler Co., 324 F.2d at 450; NLRB v.

Monroe Auto Equipment Co., 368 F.2d at 981. The fact that prior to the discharge the employees had engaged in protected activities, standing alone, does not supply that quantum of proof demanded by the Act. The Board completely ignores additional acts of misconduct on the part of the three employees which occurred between the date of the letter and the date of discharge.

■ On April 21, Tyler told Lassiter that if certain demands were not met by April 25 the employees would take their complaints to the hospital administration, an action which would have been detrimental to Red Top's business interests. On April 23, at a committee meeting, Tyler and Walton threatened Lassiter with physical reprisal if he criticized Walton's work again and Tyler made disparaging remarks about Lassiter's performance as manager and about his naval service, Lassiter having recently retired from the Navy with the rank of lieutenant commander after 32 years of service. On Sunday, April 27, Tyler failed to report to work or to call in. Then at a committee meeting, two days later he refused to work on Sundays, and stated that if he was fired for this he would take Lassiter and others with him. Tyler called Lassiter a liar without justification. Tyler asked when supervisor-trainee Starks would become a supervisor and warned Starks to be careful or he would get the same treatment others had, which the Trial Examiner found to mean would lose his job. Svoboda lost his temper, pounded his fist on Lassiter's desk and uttered curse words.

■ The Board seems to look only to the form and not the substance of the presentation of the grievances. The Trial Examiner found that the committee was acting for improper and unprotected motives, that of causing Lassiter to be replaced as manager. The Board does not dispute this. While not expressing it clearly, the Board seems to be acting on the theory that the motivation of the employees is not determinative of the issue of whether they were

engaged in a protected activity. This is not the case. It is difficult to even imagine that Congress intended the National Labor Relations Act to protect employee conspiracies against an unpopular manager. Thus the question of whether or not the three employees pressed their alleged grievances in good faith becomes vitally important.

In Socony Mobile Oil Co. v. NLRB, 357 F.2d 662 (2d Cir. 1966), the issue was raised of suspension of an employee for presenting a complaint to a governmental regulatory body. The court held that the suspension was unlawful, but went on to state that had the complaint been made in bad faith the employee would not have been engaged in protected activity. See also, Walls Mfg. Co. v. NLRB, 116 U.S.App.D.C. 140, 321 F.2d 753, cert. denied, 375 U.S. 923, 84 S.Ct. 265, 11 L.Ed.2d 166 (1963).

■ In discussing the discharge of employees, the Supreme Court held:

"The Act does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them. The employer may not, under cover of that right, intimidate or coerce its employees with respect to their self-organization and representation, and, on the other hand, the Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion." NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45–46, 57 S.Ct. 615, 628, 81 L.Ed. 893 (1937).

This Court has held:

"It must be remembered that it is not the purpose of the Act to give the

Board any control whatsoever over an employer's policies, including his policies concerning tenure of employment, and that an employer may hire and fire at will for any reason whatever, or for no reason, so long as the motivation is not violative of the Act." NLRB v. Ace Comb Co., 342 F.2d 841, 847 (8th Cir. 1965).[4]

The burden of proving an unlawful discharge is upon the Board. Kellwood Co., Ottenheimer Bros. Mfg. Div. v. NLRB, 411 F.2d 493, 498 (8th Cir. 1969); Illinois Ruan Transport Co. v. NLRB, 404 F.2d 274, 278–279 (8th Cir. 1968); NLRB v. Monroe Auto Equipment Co., 368 F.2d at 980; NLRB v. Comfort, Inc., 365 F.2d 867, 871 (8th Cir. 1966).

■ On the record we cannot hold that the finding by the Board that the three employees were engaged in protected activities is supported by substantial evidence. A considerable part of the offensive activity did not fall within the perimeter of protected activity, but, assuming arguendo that the employees were engaged in protected activity, there is a point where their methods of engaging in that activity would take them outside the protection of the Act.[5] As to Tyler and Walton, they passed that point when they threatened Lassiter with physical violence if he criticized Walton's work again. It was Lassiter's job to supervise Walton's work. The grievances procedure could have been used to eliminate this criticism by showing that the area has been cleaned but had become dirty again through normal use, which was not the case here as the evidence showed an accumulation of several days' dirt in an area that required daily cleaning, or by showing that the standards by which the area was judged were

4. Accord, Kellwood Co., Ottenheimer Bros. Mfg. Div. v. NLRB, 411 F.2d 493, 497–498 (8th Cir. 1969); NLRB v. Arkansas Grain Corp., 392 F.2d 161, 167 (8th Cir. 1968); NLRB v. Monroe Auto Equipment Co., 368 F.2d 975, 980–981 (8th Cir. 1966); NLRB v. Comfort, Inc., 365 F.2d 867, 871 (8th Cir. 1966); Fort Smith Broadcasting Co. v. NLRB, 341 F. 2d 874, 879 (8th Cir. 1965).

5. The Trial Examiner specifically found "I conclude that the actions of Tyler, Svoboda and Walton exceeded the bounds of the broad area of conduct which the Board holds would be tolerated in the interests of safeguarding the collective bargaining and grievances procedure encouraged and protected by the act."

impossible of attainment. The employees took neither of these approaches but attempted to prevent further criticism by offering a threat to their supervisor. Such threats of physical violence lie outside the protection of the Act, even where they are provoked by an unfair labor practice. NLRB v. R. C. Can Co., 340 F.2d 433 (5th Cir. 1965). In this instance the conduct has no justification and cannot be condoned by this Court.

The threat made by Svoboda in a letter to the home office to take the problems to the hospital administration constituted an act of disloyalty to the employer's business interests. Red Top's regional director, Denne, stated that he considered this a serious threat, as the hospital had retained the company to relieve itself of these problems. It is a natural inference that if the hospital is involved in these disputes it could become dissatisfied with the company. Unlawful interference with the employer's commercial interests has been recognized as presenting grounds for discharge in NLRB v. Local 1229, IBEW, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195, (1953).[6] The committee members had been previously informed that they should submit grievances to the local manager and if the grievances could not be resolved on that level to take them to Denne, Red Top's regional director.[7] In the context in which this threat was presented to Lassiter it did not constitute a bid for public sympathy or support, such as peaceful picketing, but was clearly designed to hit the employer where it would hurt, by interfering with its business relations with its customers. Presented as it was, as an ultimatum to comply with the nebulous demands of the committee, it is clear that the com-

mittee members were cognizant of the effect of such action and we can assume that they intended the natural and probable consequences which would result from such a course of action. Svoboda also was insolent to Lassiter during the course of a committee meeting with Lassiter when he pounded his fist on Lassiter's desk and used curse words.

It appears on the record that the Advisory Committee's activities were largely unprovoked by management, that unfounded accusations against Lassiter were used to harass him and excuse the lack of substantial performance in carrying out their legitimate duties of keeping the hospital in an adequate state of cleanliness. Further, the committee members' insistence on stale and mooted demands, with failure to state specifically their grievances indicate an all too apparent concert of action on their part to intimidate and harass Lassiter, to take over the supervision of the work, and to embarrass respondent Red Top in its relationship with its customers who are the source of Red Top's business.

The activity of this Committee was not confined as noted in *Bettcher Mfg. Co., supra,* to a bargaining conference, where in the interest of balanced fairness great latitude should be allowed to both sides, but transcends and extends into control of management's operation in carrying out its housekeeping functions at the hospital. As pointed out in *Bettcher,* the protection does not extend to conduct "activated by improper motives" or to "flagrant cases." There was no dispute over wages or working conditions except as respects Lassiter's naval attitude towards the employees. On the other hand the three committee members were insolent, insubordinate and intimidating; they utilized false

---

6. As stated by Mr. Justice Burton in NLRB v. Local 1229, IBEW, 346 U.S. at 472, 74 S.Ct. at 176:

   "There is no more elemental cause for discharge of an employee than disloyalty to his employer. It is equally elemental that the Taft-Hartley Act seeks to strengthen, rather than to weaken, that

cooperation, continuity of service and cordial contractual relation between employer and employee that is born of loyalty to their common enterprise."

7. Red Top repeatedly asked that a written list of specific grievances be submitted to the local manager, Lassiter, but no such list was ever submitted.

charges, threats of physical violence and threats of activity detrimental to the welfare of the business operation.

The Board apparently is enunciating a general principle that insolent, rough, and intimidating conduct cannot serve as a basis for discharge if that conduct is carried out in connection with the assertion of protected activity under § 7 of the Act and that unless such improper conduct, including threats, intimidations and acts adverse to the operation of the employer's business is "egregious," the same must be accepted as a normal and usual incident of labor-management relationships.

It is of course understandable that tempers may flare in the course of grievance meetings and that harsh and rough words may be exchanged between the parties without giving rise to a basis for discharge consistent with the protections afforded under § 7 of the Act. The use of the term egregious to denote the adjectival type of conduct warranting a basis for discharge is general in nature but appears on this record to be an apt description of the activities of the three committee members who were discharged. · Egregious is defined in Webster's New World Dictionary as "outstanding for undesirable qualities; remarkably bad; flagrant." We agree with the Trial Examiner's evaluation that the conduct was insulting, threatening and disloyal to the employer's interests; we also view such conduct as flagrant.

We do not think the approval of conduct disclosed by this record will encourage harmonious labor-management relationships nor result in the proper consideration and resolution of legitimate grievances. Quite to the contrary, it would encourage insolence, insubordination, and intimidation. We quite agree with the Board's general rationale that employees may not be discharged for rude or impertinent conduct in the course of presenting grievances and that the employees must be placed in the status of equals in dealing with management on grievances or bargaining, but we do not think the protection afforded by § 7 should extend to gross insubordination, threats of physical harm or the carrying out of activities detrimental to the employer's business relationship except to the extent that such activities consist of lawful strikes.

The Order of the Board as respects Walton, Svoboda and Tyler is denied enforcement. The Order as respects employee Barr is enforced. Inasmuch as no other employee applied for reinstatement, the other facet of the Board's order respecting reinstatement of those walking out on the night of the discharge does not appear to be necessary and is denied enforcement.