KELLY, Circuit Judge,
with whom MURPHY, Circuit Judge, joins, dissenting in part.
I respectfully dissent from Part II of the court’s opinion.
A.
In 1953, the Supreme Court in Jefferson Standard created an exception from protection under Section 7 of the Act, introducing the concept that employees could be discharged “for cause” under Section 10(c) if they engaged in “disloyalty.” The court here concludes that Jefferson Standard set out an explicit test for determining disloyalty and asserts that the Board made an “error of law” by failing to apply the test properly. But Jefferson Standard did not set out a test to apply to determine whether an employer’s “cause for discharge” was “disloyalty to his employer.” 346 U.S. at 472, 74 S.Ct. 172; see id. at 481, 74 S.Ct. 172 (Frankfurter, J. dissenting) (“The Board and the courts of appeals will hardly find guidance for future cases from this Court’s reversal of the Court of Appeals, beyond that which the specific facts of this case may afford.”); Sierra Pub. Co. v. NLRB, 889 F.2d 210, 216 (9th Cir. 1989) (the “reach” of Jefferson Standard’s “ ‘disloyalty’ test ... remains unclear”); Melinda J. Branseomb, Labor, Loyalty, and the Corporate Campaign, 73 B.U. L. Rev. 291, 306 (1993) (“Though the Court specified a number of objectionable aspects of the technicians’ conduct, it articulated the weight and relevance of none. Like the Board, it declined to formulate a test for loss of protection....” (footnote omitted)). The Board’s decision in Jefferson Standard,’ which the Supreme Court affirmed, was explicit: It refused to “attempt[ ] to formulate a test which will decide every imaginable case involving similar questions as to the scope of Section 7.” 94 N.L.R.B. at 1512. Nothing in the Supreme Court’s opinion indicates that it intended to formulate a test where the Board declined to do so.
Jefferson Standard acknowledged that the “legal principle that ... disloyalty is adequate cause for discharge is plain enough,” but it left to the Board the “difficult[ ]” task of “determining whether, in fact, the discharges are made because of such a separable cause.” 346 U.S. at 475, 74 S.Ct. 172. Read in its entirety, the opinion at best provides some potential factors that may guide the Board’s analysis in “developing and applying national *831 labor policy” and setting the boundaries of Section 7 protection. NLRB v. Curtin Matheson Sci., Inc., 494 U.S. 775, 786, 110 S.Ct. 1542, 108 L.Ed.2d 801 (1990); City Disposal Sys., 465 U.S. at 829, 104 S.Ct. 1505 (“We have often reaffirmed that the task of defining the scope of § 7 ‘is for the Board to perform in the first instance as it considers the wide variety of cases that come before it....’ ” (quoting Eastex, 437 U.S. at 568, 98 S.Ct. 2505)). Where the Supreme Court has not articulated a particular standard to follow, the Board acts within its discretion in formulating its own test and in assigning weight to the relevant factors. See Sierra Pub. Co., 889 F.2d at 218-19 (“The relative weight to be given each of these factors can be debated, but we conclude that the Board acted appropriately in considering them.” (footnote omitted)): As discussed more fully below, the Board reasonably concluded that employee communications criticizing their employer’s product do not lose the protection of Section 7 when (1) the “attack related itself to [a] labor- practice of the company,” Jefferson Standard, 346 U.S. at 476, 74 S.Ct. 172, and (2) the employees responsible for the communications lack a “calculat[ing]” or “deliberate[ ]” motive to harm their employer, id. at 471, 74 S.Ct. 172.
1.
The court reads Jefferson Standard as stating that the technicians’ handbills would constitute unprotected disloyalty regardless of whether their distribution was “a concerted activity wholly or partly within the scope of those mentioned in § 7.” Id. at 477, 74 S.Ct. 172. According to the court, the Board “overruled” this portion of Jefferson Standard by protecting disloyal communications because they are “part of or related to an ongoing labor dispute.” The test applied by the Board is much narrower than this, however, and is fully permissible under Jefferson Standard.
The Board did not look for a tangential connection or mere contemporaneousness with a labor dispute. Rather, in the first step of its analysis, the Board examined whether the communications themselves “indicate” that they are “expressly related to” or “directly linked to” an ongoing labor dispute. MikLin, 361 N.L.R.B. No. 27 at *3. The Board concluded that because they included the phrase “Help Jimmy John’s Workers Win Sick Days,” the posters and press release “clearly connected” the potential risk to the public of eating food prepared by sick employees to the central issue in the labor dispute. Id The Board asked not merely whether the communications were part of or related to a protected activity, but whether the communications indicated on their face a connection to an ongoing labor dispute. This distinction is an important one. While Jefferson Standard arguably found that the former communications can be unprotected disloyalty, it at least left open and arguably suggests that the latter communications should be protected by Section 7.
“[C]oncerted activity” can be “wholly or partly within the scope of’ protection under Section 7 without facially indicating a direct link to a labor dispute. Jefferson Standard, 346 U.S. at 477, 74 S.Ct. 172; see, e.g., Eastex, 437 U.S. at 569-70, 98 S.Ct. 2505 (holding that a newsletter that “urg[ed] employees to write their legislators to oppose incorporation of the state ‘right-to-work’ statute into a revised state constitution,” “criticiz[ed] a Presidential veto of an increase in the federal minimum wage[,] and urg[ed] employees to register to vote” was protected concerted activity); see NLRB v. RELCO Locomotives, Inc., 734 F.3d 764, 785-86 (8th Cir. 2013) (“[A]ction which involves only a speaker and a listener can qualify as concerted action if it *832 had some relation to group action in the interest of the employees.” (emphasis added) (internal quotation omitted)). Jefferson Standard itself addressed such a communication. Unlike the poster and press release here, the handbills in Jefferson Standard “made no reference to the union, to a labor controversy or to collective bargaining.” 346 U.S. at 468, 74 S.Ct. 172. Although the handbills were related to a “pending labor controversy,” the Court found they were a “separable attack” from the pending dispute because they “related ... to no labor practice,” “made no reference to wages, hours or working conditions,” and “omitted all reference to” and, in fact, “diverted attention from” the ongoing labor controversy. Id. at 476, 74 S.Ct. 172. The Court was not presented with a communication that was directly linked to a labor dispute on its face — and thus its holding cannot be binding here — but the reasoning offered by Jefferson Standard suggests that the absence of such a connection was crucial to its conclusion that the handbills were unprotected disloyalty.
Like Jefferson Standard, the Board draws a line between communications (like the handbills) that fall under Section 7 because they relate to or “coexist! ]” with a labor dispute — which can lose protection due to disloyalty — and those (like the poster and press release) that fall under Section 7 because they directly attack a labor practice of the company — which Jefferson Standard suggests may not lose protection based on disloyalty. Id. The Board here found the communications were not disloyal in part because the poster and press release explicitly attacked the company’s sick leave policy. MikLin, 361 N.L.R.B. No. 27 at *3. Its determination was based on a long-adhered-to rule, upheld by several courts, requiring that communications that disparage an employer’s product must directly reference a labor dispute in order to receive protection under Section 7. See Sierra Pub. Co., 889 F.2d at 217 & n.9 (holding that the Board’s focus on the link between the union’s letter and the labor dispute was “appropriate” because “[tjhis feature was central to the Supreme Court’s reasoning in Jefferson Standard”): Endicott, 453 F.3d at 537 (finding “the Board’s formulation [of the two-part test] accurately reflects the holding in Jefferson Standard”); see, e.g., Five Star, 349 N.L.R.B. at 44 (refusing to extend Section 7 protection because “the content of their letters was not sufficiently related to the drivers’ terms and conditions of employment,” even though “they were written as part of the drivers’ letter-writing campaign”); Am. Golf Corp., 330 N.L.R.B. at 1241 (concluding flyer was unprotected disloyalty even though it was circulated during other protected activities, because it “omitted all reference to the labor controversy and attacked policies of the Respondent with no discernible relation to it”). This portion of the Board’s disloyalty standard accurately reflects the reasoning articulated in Jefferson Standard, and at the very least does not “overrule” it.
2.
The court also concludes that the Board overruled Jefferson Standard by requiring that an employee’s disparaging communication evidence a malicious motive to harm the employer. But this requirement does not come from Jefferson Standard. Me the Board acknowledges that the fust element of its test — that the communication indicate its direct relation to the labor dispute — originates from Jefferson Standard, MikLin, 361 N.L.R.B. No. 27 at *7, it makes no similar assertion with regard to the motive element. In fact, the Board cites only NLRB decisions in support of this requirement. Id at *5-6; see Veeder-Root Co., 237 N.L.R.B. 1175, 1176-77 (1978) (describing how the Board devel *833 oped the maliciousness standard in an “attempt[ ] over the years to balance the right of employees to engage in concerted activities” under Section 7 and the employer’s right under Section 10(c) “to maintain plant discipline and to bar inflammatory material from its premises”). Because the Board’s motive requirement comes from its own precedent and not from the Supreme Court, it is entitled to this court’s deference. See Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 364, 118 5.Ct. 818, 139 L.Ed.2d 797 (1998) (“Courts must defer to the requirements imposed by the Board if they are rational and consistent with the Act.” (internal quotation omitted)); Pub. Serv. Co. of N.M. v. NLRB, 843 F.3d 999, 1004 (D.C. Cir. 2016) (the Board’s interpretation of its own precedent is entitled to deference).
The Board’s reliance on motive is not an unreasonable interpretation of Section 7. Both the Supreme Court and our court have affirmed the centrality of motive in the disloyalty analysis. In NLRB v. Washington Aluminum Co., 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962), the Court rejected the argument that employees who had left their work in a machine shop without permission because it was too cold had lost Section 7 protection due to disloyalty. Id. at 17, 82 S.Ct. 1099. The Court found their activities “cannot be classified as ‘indefensible’ ” disloyalty because “concerted activities by employees for the purpose of trying to protect themselves from working conditions” they find intolerable are “unquestionably” protected by the Act. Id. Thus, the Court found Jefferson Standard’s disloyalty principle did not apply where the employees’ purpose was to improve working conditions.
We went even further in NLRB v. Red Top, Inc., 455 F.2d 721 (8th Cir. 1972), making clear that the Board must look at motive when determining whether to extend Section 7 protection to disparaging conduct. There, the Trial Examiner found that housekeeping employees were properly discharged because they engaged in a campaign to secure the removal of their manager, including by threatening to and making complaints to one of their employer’s customers. Id at 724. The Board reversed, but we agreed with the Trial Examiner, finding the conduct was “insulting, threatening, and disloyal,” id. at 728, and stating:
The Trial Examiner found that the committee was acting for improper and unprotected motives, that of causing Lassi-ter to be replaced as manager. The Board does not dispute this. While not expressing it clearly, the Board seems to be acting on the theory that the motivation of the employees is not determinative of the issue of whether they were engaged in a protected activity. This is not the case. It is difficult to even imagine that Congress intended the National Labor Relations Act to protect employee conspiracies against an unpopular manager. Thus the question of whether or not the three employees pressed their alleged grievances in good faith becomes vitally important.
Id. at 725-26. These cases establish that motive is not only relevant to the disloyalty analysis, it is “vitally important.” Id. at 726.[6]
*834 The importance of motive in the disloyalty analysis is also consistent with Jefferson Standard. The Court approved of the Board’s consideration of the fact that the technicians “deliberately undertook to alienate their employer’s customers by impugning the technical quality of his product.” 346 U.S. at 471, 74 S.Ct. 172 (emphasis added). Examining whether the employees deliberately used methods intended to harm the employer suggests the Court considered the employees’ purpose or motive to be part of the disloyalty inquiry. See also Montefiore, 621 F.2d at 517 (“Underlying [Jefferson Standard] is the principle that while legally striking employees are generally entitled to enlist the consensual support of the public for their cause they may not ... deliberately inflict on the employer economic harm unnecessary to the legitimate concerted activities.”).[7]
Relying solely on Jefferson Standard, the court asserts that by requiring employees to evince a motive to harm their employer, the Board has “effectively removed” an inquiry into the indefensibility of the means used by the employees. The Board’s decision here demonstrates that it did in fact examine the means used by the employees. The Board explained that the poster and press release were protected because they “did not use inflammatory language,” their “message did not stray from the context of the labor dispute,” and they “only suggested] the realistic potential for illness.” MikLin, 361 N.L.R.B. No. 27 at *7-8. It specifically examined the communications from an objective perspective, concluding that “any person viewing the posters and press release would reasonably understand that the motive for the communications was to garner support for the campaign to improve the employees’ terms and conditions of employment by obtaining paid sick leave rather than to disparage [MikLin] or its product.” Id. at *3. As the dissenting member explained, requiring a “disloyal malicious intent” does not subvert the Board’s examination of the means used because motive need not be independently proven; instead, it “may be inferred from the circumstances of a particular protest.” Id. at *12 (Johnson, M., dissenting in part); see, e.g., Five Star, 349 N.L.R.B. at 46 (“[T]hese three drivers used inflammatory language — again, in the context of incidents not related to the drivers’ group concerns — to describe the Respondent in a manner that suggested that the drivers intended to damage the Respondent’s reputation.” (emphasis added)). In my view, the Board’s malicious motive requirement — which originated in the NLRB’s own case law and is supported by several precedential court decisions — does not “effectively remove” or “overrule” Jefferson Standard’s disloyalty principle.
B.
When the Board adopts a standard that carries out its interpretation of the Act, its. reasonable rule is entitled to “considerable deference.” City Disposal Sys., 465 U.S. at 829, 104 S.Ct. 1505; accord ABF Freight Sys., Inc. v. NLRB, 510 U.S. 317, 324, 114 S.Ct. 835, 127 L.Ed.2d 152 (1994). Yet the court affords no deference to the Board’s formulation of its disloyalty test. It contends no deference is warranted because the Board was interpreting Jefferson Standard, not applying its own interpretation of the Act. As discussed above, however, the Board did not interpret Jefferson Standard when it added the malicious motive requirement. Thus, this explanation for de *835 novo review at most pertains only to the Board’s conclusion that the disloyalty exception applies where the communication directly references an ongoing labor dispute.
At least as to the malicious motive element, traditional Chevron deference applies.[8] See Hormel, 962 F.2d at 1065 (applying Chevron deference to the Board’s subjective test for determining whether an employee’s support of a boycott violated his duty of loyalty). In Brand X, 545 U.S. at 983, 125 S.Ct. 2688, the Supreme Court stated that “a court’s opinion as to the best reading of an ambiguous statute an agency is charged with administering is not authoritative. ... Instead, the agency may ... choose a different construction, since the agency remains the authoritative interpreter (within the limits of reason) of such statutes.” Pursuant to Brand X, “[o]nly a judicial precedent holding that the statute unambiguously forecloses the agency’s interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction.” Id. at 982-83, 125 S.Ct. 2688.[9]
Applying Brand X here, it is evident that Jefferson Standard did not interpret Sections 7 or 10(c) to unambiguously foreclose the Board from considering whether the employee had malicious motive, nor did it unambiguously require the Board to look only at an employee’s means to determine whether an employee demonstrated detrimental disloyalty. See id. at 985, 125 S.Ct. 2688 (“Before a judicial construction of a statute ... may trump an agency’s, the court must hold that the statute unambiguously requires the court’s construction.”); Branscomb, supra, 73 B.U. L. Rev. at 384 (“[T]he Jefferson Standard Court did not declare that a disloyalty test is the only reasonable interpretation of the Act....”). The Jefferson Standard Court relied on the Act’s policy, not its plain language. See 346 U.S. at 472-74, 472 n.9, 74 S.Ct. 172. It made clear that its interpretation of the statute “leaves ... room for agency discretion,”. Brand X, 545 U.S. at 982, 125 S.Ct. 2688, to determine whether discharges are made because of disloyalty, see 346 U.S. at 475, 74 S.Ct. 172. Much like the Jefferson Standard Court, I do not believe that the “statute’s plain terms directly addres[s]” whether the Board may require evidence of an employee’s malicious motive to sustain the discharge of an employee for disloyalty. Brand X, 545 U.S. at 982, 125 S.Ct. 2688 (alteration in original) (internal quotation omitted); see Hormel, 962 F.2d at 1065 (“Nothing in the text or the legislative history of the NLRA addresses the specific question of the test the Board should use to define the contours of an employee’s duty of loyalty.”).[10]
*836 Because the statute is ambiguous on the question, “we defer ... to the agency’s interpretation so long as the construction is ‘a reasonable policy choice for the agency to make.’ ” Brand X, 545 U.S. at 986, 125 S.Ct. 2688 (quoting Chevron, 467 U.S. at 845, 104 S.Ct. 2778); see Curtin Matheson Sci., 494 U.S. at 786, 110 S.Ct. 1542 (holding that Board has “considerable deference” in determining the legal rule to apply and should be upheld “as long as it is rational and consistent with the Act”). It would be difficult to conclude that the Board made an unreasonable policy choice when, in Washington Aluminum and Red Top, the courts found the employees’ motives determinative in the application of the disloyalty exception, and even Jefferson Standard relied on employee motive in its analysis. See Palmetto Prince George Operating, LLC v. NLRB, 841 F.3d 211, 216 (4th Cir. 2016) (applying Brand X and concluding that “the Board adopted a reasonable interpretation” of the Act where it “did nothing more than implement guidance offered directly by the Supreme Court”).[11] I therefore conclude that the Board’s requirement that there be evidence of the employees’ malicious motive to reach a finding of disloyalty should be upheld because it is “a permissible construction of the statute.” Minn. Licensed Practical Nurses Ass’n v. NLRB, 406 F.3d 1020, 1025 (8th Cir. 2005) (quoting Chevron, 467 U.S. at 843, 104 S.Ct. 2778).
The court refuses to follow Brand X, asserting it “would leave the Board free to disregard any prior Supreme Court or court of appeals interpretation of the NLRA.”[12] That is in fact what Brand X allows, at least when the Act is ambiguous and the Board’s interpretation reasonable. See Gutierrez-Brizuela v. Lynch, 834 F.3d 1142, 1143 (10th Cir. 2016) (Gorsuch, J.) (“[I]n recent years the Supreme Court has instructed us that, when a statute is ambiguous and an executive agency’s interpretation is reasonable, the agency may indeed exercise delegated legislative authority to overrule a judicial precedent in favor of the agency’s preferred interpretation.”). Because Jefferson Standard did not hold that Sections 7 and 10(c) unambiguously required a disloyalty test that excluded a requirement that there be evidence of the employees’ malicious motive, the Board was free, within the limits of reasonableness, to construe -the statutes to require such evidence.[13]
*837 c.
Furthermore, the court’s definition of the “critical question” that the Board and courts must address in disloyalty cases unjustifiably limits the protections of the Act. It sets up a dichotomy in which communications “reasonably targeted at the employer’s labor practices” are not disloyal, but those that “indefensibly disparage! ] the quality of the employer’s product or services” are disloyal. But this dichotomy finds no support in the case law[14] or in any practical understanding of labor disputes. In many cases, including this one, employees’ communications reflect a direct link between an employer’s labor practice and the quality of the employer’s product or service. See Diamond Walnut, 113 F.3d at 1278 (Wald, J. concurring in part and dissenting in part) (“[Ejmployees often seek to demonstrate how their interests and those of the public coincide by arguing that labor disputes or poor working conditions are harming the employer’s product.”); see, e.g., Montefiore, 621 F.2d at 517 (striking doctors told patients “they would receive better medical care if they went to a ‘full service, non-struck facility’ ”); St. Lukes, 268 F.3d at 578 (nurse accused the hospital of “jeopardizing the health of mothers and babies by offering her and her counterparts short shifts and more responsibilities”); Greyhound Lines, 660 F.2d at 355, 357 (bus drivers’ “press release announcing the intent of employee drivers to strictly obey the speed limit” suggested that the “ ‘slowdown’ was in protest of the enumerated grievances”). Case in point, the Board here concluded, and the court appears to agree, that “the safety issue raised [in the posters and press release] — employees working while they are sick — was directly related to and in furtherance of the ongoing dispute over the Respondent’s failure to provide paid sick leave.” MikLin, 361 N.L.R.B. No. 27, at *7. By limiting the content of employees’ communications to attacks on the employer’s labor practices and barring most product disparagement, the court “de-privets] employees of what may be their most cogent argument for obtaining the third party’s aid,” Diamond Walnut, 113 F.3d at 1279 (Wald, J., concurring in part and dissenting in part) (internal quotation omitted), “dampen[s] the ardor of labor debate!,] and truncate[s] the free discussion envisioned by the Act,” Linn, 383 U.S. at 64, 86 S.Ct. 657. See Sierra Pub. Co., 889 F.2d at 217 (“If unions are not permitted to address matters that are of direct interest to third parties in addition to complaining about their own working conditions, it is unlikely that workers’ undisputed right to make third party appeals in pursuit of better working conditions would be anything but an empty provision.”); Red Top, 455 F.2d at 728 (“[H]arsh and rough words may be exchanged between the parties without giving rise to a basis for discharge consistent with the protections afforded under § 7 of the Act.”). It is not for this court to say that public communications targeting the employer’s labor prac *838 tices “further the policy of the NLRA,” while those attacking product quality do not. “Delineat[ing] precisely the boundaries” between protected and unprotected communications should be left to the Board. Eastex, 437 U.S. at 568, 98 S.Ct. 2505.
D.
In its merits analysis, the court criticizes the Board for requiring evidence of employees’ malicious motive, but the court’s merits analysis proves how crucial motive is to a disloyalty determination. The- court looks to several aspects of the employees’ intent: that they “cho[se] March as a ‘good time’ to launch” their campaign, they “understood” the importance of MikLin’s “ ‘clean’ public image” and yet directly attacked it, and they engaged in a “calculated, devastating” attack on MikLin’s product. As the court admits, the “[e]mployees’ conscious decision to scare MikLin customers ... was strong evidence of their intent to disparage MikLin....”[15]
In any event, according the appropriate deference to the disloyalty standard applied by the Board, I cannot say that the Board erred in finding that the poster and the press release fell short of unprotected disloyalty. Considering both the employees’ subjective intent and the reasonableness of the means used, the Board found that the communications were directly tied to the dispute over MikLin’s sick-leave policy, and the employees questioned the health of the product in an effort to solicit the public’s support to change that policy. The communications described the quality of MikLin’s product only in terms of how it was affected by the lack of paid sick leave. The posters targeted an audience within a two-block radius of a MikLin store and identified the person the audience should contact to show support. The language used was not inflammatory, or intended to degrade or humiliate. Nonetheless, reasonable minds could, and did, differ as to whether the means used by the employees crossed the line from protected concerted activity into unprotected “detrimental disloyalty.” Jefferson Standard, 346 U.S. at 472, 74 S.Ct. 172. Because I perceive this as a “choice between two fairly conflicting views,” I believe we must affirm the Board’s decision. Midwest Precision Heating & Cooling, Inc. v. NLRB, 408 F.3d 450, 458 (8th Cir. 2005) (quotation omitted). Accordingly, I would defer to the Board’s finding that the Sandwich Poster campaign communications were not so disloyal as to lose protection under the Act.
E.
Because I conclude that the posters were protected activity, I would accordingly find, deferring to the factual conclusions of the Board, that MikLin co-owner Robert Mulligan’s Facebook posting, which solicited employees to remove the posters, violated Section 8(a)(1).
Appendix A
*839 [[Image here]]

. The court cites St. Luke's Episcopal-Presbyterian Hospitals, Inc., 268 F.3d 575, for the proposition that "our cases confirm that an employee’s disloyal statements can lose Section 7 protection without a showing of actual malice.” But St. Luke's addresses only whether the employee's communications, were unprotected because they were untrue. St. Luke's had nothing to say about an employee’s disloyal statements; the term “disloyal” appears nowhere in its analysis.

. The Board’s decision to incorporate motive into its disloyalty analysis is also supported by the plain language of the term: "disloyalty ... focus[es] on one’s subjective state of mind.” Branscomb, supra, 73 B.U. L. Rev. at 322 n.144, 331.

. Even though the Board adopted the first element of its disloyalty test — the direct link— from Jefferson Standard, Brand X may apply. Nothing in Brand X limits its application based on the origin of the agency’s test. See Branscomb, supra, 73 B.U. L. Rev. at 384 ("The Board has the power to.reject the Jefferson Standard disloyalty test, and such a rejection would not amount to an impermissible attempt to ‘overrule’ a higher Court.’’).

. Courts have held that Brand X applies to judicial precedent from the Supreme Court. See, e.g., United States v. Home Concrete & Supply, LLC, 566 U.S. 478, 132 S.Ct. 1836, 1843, 182 L.Ed.2d 746 (2012) (plurality op.); Hernandez-Carrera v. Carlson, 547 F.3d 1237, 1247-28 (10th Cir. 2008); see also Sandoz Inc. v. Amgen Inc., - U.S. -, 137 S.Ct. 1664, 1678, 198 L.Ed.2d 114 (2017) (Breyer, J., concurring); Cuomo v. Clearing House Ass’n, L.L.C., 557 U.S. 519, 548, 129 S.Ct. 2710, 174 L.Ed.2d 464 (2009) (Thomas J., dissenting).

.Although it is not entirely clear, the court does not appear to contest my conclusion that Jefferson Standard's disloyalty principle — to *836 the extent it is definable — is merely one interpretation of the ambiguous language in Sections 7 and 10(c).

. I recognize that the Hormel court came to a different conclusion. 962 F.2d at 1065. Hormel, however, addressed the Board’s standard for determining whether an employee "supported] the consumer boycott” of the employer’s product, not the standard for determining whether such support is disloyal. Id. at 1064 (emphasis added). Here, by contrast, there is no dispute the employees supported the posters and press release, and we address only whether those tactics were disloyal.

. Brand X rejected the court’s interpretation of the cases it cites, stating that the conclusion that stare decisis required an agency to follow the court’s' construction of a statute was based on a "mistaken reading" of the cases. 545 U.S. at 984, 125 S.Ct. 2688 (citing Neal, 516 U.S. 284, 116 S.Ct. 763, 133 L.Ed.2d 709, Lechmere, 502 U.S. 527, 112 S.Ct. 841, 117 L.Ed.2d 79, and Maislin, 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94). According to the Supreme Court, Neal, Lech-mere, and Maislin "allow a court's prior interpretation of a statute to override an agency's interpretation only if the relevant court decision held the statute unambiguous.” Id.

.The court also asserts that Brand X does not apply where the Board is interpreting "a statute intended to limit the Board’s authority.” Nothing in Brand X — or any other case— supports such a limitation. In any event, “[tjhere is no indication ... that [Section 10(c)] was designed to curtail the Board’s power in fashioning remedies when the loss *837 of employment stems directly from an unfair labor practice.” Fibreboard, 379 U.S. at 217, 85 S.Ct. 398.

. In support of this distinction, the court cites Diamond Walnut, where striking union workers distributed leaflets that "described Diamond's workforce as composed of 'scabs' who packaged walnuts contaminated with 'mold, dirt, oil, worms and debris.' ” 113 F.3d at 1261. But the Diamond Walnut court never addressed whether this activity was protected under Section 7 or would constitute cause for discharge under Section 10(c) because the petitioner never challenged these conclusions. Id. at 1267. Instead, the court addressed whether the employer had a substantial business justification for refusing to replace returning strikers in their selected jobs. Id. at 1263. To the extent the Diamond Walnut court addressed disloyalty, it did so only in dicta. See id. at 1267 n.8.

. Similarly, while the court expressly limits its legal analysis to the disloyalty exception, its merits analysis relies heavily on an unaddressed basis for losing the Act’s protection: its conclusion that the communications were maliciously untrue. Reasonable minds could conclude that alleged falsities in the poster and press release gave MikLin cause to discharge the employees, but such a conclusion does not rest on the court's definition of disloyalty. See Five Star, 349 N.L.R.B. at 46 (in evaluating disloyalty, "[i]t matters not whether the communications were true or false”).