# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-3099

_____

MikLin Enterprises, Inc., doing business as Jimmy John's

*Petitioner*

v.

National Labor Relations Board

*Respondent*

Industrial Workers of the World

*Intervenor*

_____

No. 14-3211

_____

National Labor Relations Board

*Petitioner*

v.

MikLin Enterprises, Inc., doing business as Jimmy John's

*Respondent*

Industrial Workers of the World

*Intervenor*

_____

Petitions for Review of an Order of the
National Labor Relations Board
_____

Submitted: September 19, 2016
Filed: July 3, 2017
_____

Before RILEY, Chief Judge,* WOLLMAN, LOKEN, MURPHY, SMITH, COLLOTON, GRUENDER, BENTON, SHEPHERD, and KELLY, Circuit Judges, *En Banc*.

_____

LOKEN, Circuit Judge, with whom SMITH, Chief Judge, WOLLMAN, RILEY, GRUENDER, and SHEPHERD, Circuit Judges, join.

MikLin Enterprises, Inc. ("MikLin") petitions for review of a National Labor Relations Board ("Board") Order holding that MikLin violated Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act ("NLRA" or "the Act"), 29 U.S.C. §§ 158(a)(1) and (3), when it (i) discharged and disciplined employees who publicly distributed posters suggesting that MikLin's "Jimmy John's" sandwiches posed a health risk to consumers; (ii) solicited employees to aid in removing the posters; (iii) encouraged employees to disparage a union supporter; and (iv) removed union literature from in-store bulletin boards. MikLin argues that the Board misapplied governing law and its decision is not supported by substantial evidence. The Board cross-petitions for enforcement of its Order. A divided panel enforced the Order in its entirety. We granted rehearing en banc and vacated the panel decision. We now conclude that the means the disciplined employees used in their poster attack were

_____

*The Honorable William Jay Riley stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 10, 2017. He has been succeeded by the Honorable Lavenski R. Smith.

so disloyal as to exceed their right to engage in concerted activities protected by the NLRA, as construed in a controlling Supreme Court precedent, NLRB v. Local Union No. 1229, IBEW, 346 U.S. 464 (1953) ("Jefferson Standard"). We therefore decline to enforce the determination that MikLin violated the Act by disciplining and discharging those employees and by soliciting removal of the unprotected posters. We enforce the remainder of the Order, as so modified.

## I. Background.

**A. The "Sick Day Posters" Campaign.** MikLin is a family enterprise that owns and operates ten Jimmy John's sandwich-shop franchises in the Minneapolis-St. Paul area. Michael Mulligan is president and co-owner; Robert Mulligan, his son, is vice-president. In 2007, several MikLin workers began an organizing campaign seeking representation by the Industrial Workers of the World ("IWW") union. The IWW lost a Board-conducted election in October 2010, filed unfair labor practice charges and objections to the election with the Board, and continued its organizing campaign by urging MikLin to provide employees holiday pay in late 2010. On January 10, 2011, MikLin and the IWW settled the IWW's objections. MikLin admitted no wrongdoing but agreed to a Board-conducted rerun election if the IWW filed for the election after sixty days but not later than after eighteen months.

With the holiday season passed, the IWW decided its next "march on the boss" group action would be to demand paid sick leave. The IWW concluded that the approach of flu season was a good time to raise the issue. At this time, MikLin's handbook required any employee who would be absent from a shift to find a replacement and notify the store manager. Rule 11 of Jimmy John's Rules for Employment, which employees received when hired, stated: "Find your own replacement if you are not going to be at work. We do not allow people to simply call in sick! We require our employees and [managers] to find their own replacement! NO EXCEPTIONS!" Failure to follow this procedure resulted in termination.

MikLin did not offer paid leave for sick employees, though an employee with sufficient tenure was entitled to paid leave to care for a sick child.

Organizers of the IWW sick leave campaign began their attack in late January and early February 2011 by designing and posting on community bulletin boards in MikLin stores posters that prominently featured two identical images of a Jimmy John's sandwich. Above the first image were the words, "YOUR SANDWICH MADE BY A HEALTHY JIMMY JOHN'S WORKER." The text above the second image said, "YOUR SANDWICH MADE BY A SICK JIMMY JOHN'S WORKER." "HEALTHY" and "SICK" were in red letters, larger than the surrounding text in white. Below the pictures, white text asked: "CAN'T TELL THE DIFFERENCE?" The response, in red and slightly smaller: "THAT'S TOO BAD BECAUSE JIMMY JOHN'S WORKERS DON'T GET PAID SICK DAYS. SHOOT, WE CAN'T EVEN CALL IN SICK." Below, in slightly smaller white text, was the warning, "WE HOPE YOUR IMMUNE SYSTEM IS READY BECAUSE YOU'RE ABOUT TO TAKE THE SANDWICH TEST." Text at the bottom of the poster asked readers to help the workers win paid sick days by going to their website.

MikLin managers quickly removed the posters from store bulletin boards. On the morning of March 10 -- the day before the IWW could request a rerun election -- IWW supporters distributed a press release, letter, and the sandwich poster to more than one hundred media contacts, including local newspapers and major news outlets such as the Associated Press, Reuters, Bloomberg, and NBC News. The press release highlighted "unhealthy company behavior." Its second sentence framed the message: "As flu season continues, the sandwich makers at this 10-store franchise are sick and tired of putting their health and the health of their customers at risk." The release declared: "According to findings of a union survey, Jimmy John's workers have reported having to work with strep throat, colds and even the flu." The release ended with a threat: if Robert and Michael Mulligan would not talk with IWW supporters

about their demands for paid sick leave, the supporters would proceed with "dramatic action" by "plastering the city with thousands of Sick Day posters."

Employees attached to the press release a "sick leave letter" to the Mulligans which asserted that health code violations occur at MikLin stores nearly every day. The employees complained: "By working sick, we are jeopardizing the entirety of [the company's] image and risking public safety." The letter accused MikLin of refusing to put customers first, risking customers' health, and "shoving [customers] to the bottom of the well of importance." Like the press release, the letter concluded with a threat: if the Mulligans would not meet the employees' demands, the campaign would "move forward with [its] Sick Day posters by posting them not only in stores, but on the University's Campus, in hospitals, on street corners, and any other place where postings are common, citywide."

Also on March 10, four organizers met with Robert Mulligan. They told Mulligan that MikLin's attendance policy and low wages pressured employees to work while sick. Mulligan said MikLin was in the process of reforming its policies. The organizers provided Mulligan a printed version of their letter and press release and warned that, unless MikLin took action to fix the sick day policy within ten days, employees would display sandwich posters throughout the area. Employees who attended felt they had achieved some "common ground."

MikLin posted a new sick leave policy in each store on March 16. The new policy provided a sliding scale of disciplinary points for absences. An employee who did not report but found a replacement would receive no points. An absent employee who could not find a replacement but notified the store manager at least one hour before shift start would receive one point. An absent employee without a replacement who called less than one hour prior to shift start would receive two points. An absent employee who did not call the manager and did not find a replacement would receive three points. An employee who received four disciplinary points within a twelve-

month period would be terminated. The policy emphasized: "With regard to absenteeism due to flu like symptoms, Team Members are **not allowed** to work unless and until those symptoms have subsided for 24 hours." Between March 10 and March 20, MikLin posted a notice in its stores reminding workers: "[f]or those who 'don't feel good' we have a policy that expects them to find a replacement for their shift . . . . [T]he record clearly shows that we have demonstrated flexibility with regard to excusing those who cannot find replacements."

On March 20, IWW supporters implemented their threat to plaster the city with a new version of the Sick Day posters they had placed in MikLin stores in January and February. The bottom of the publicly distributed posters incorporated one change: rather than asking for support of the employees' request for paid sick leave, the public posters listed Robert Mulligan's personal telephone number and instructed customers to call him to "LET HIM KNOW YOU WANT HEALTHY WORKERS MAKING YOUR SANDWICH!" A copy of the publicly distributed posters appears as Appendix A to this opinion. Organizers placed posters in various locations near MikLin stores, including lampposts, trash cans, and mailboxes. Robert Mulligan testified that he was "bombarded by phone calls" for close to a month from people who thought it was unsafe to eat at Jimmy John's. Concerned about the effect on MikLin's business, Mulligan and some managers took down the public posters. On March 22, MikLin fired six employees who coordinated the attack and issued written warnings to three who assisted.

The IWW continued its sick leave attack. In a press release issued a day after the terminations, a discharged employee stated: "It just isn't safe -- customers are getting their sandwiches made by people with the flu, and they have no idea . . . . [R]ather than safeguard public health and do the right thing for their employees and their customers, Jimmy John's owners Mike and Rob Mulligan are trying to silence us." On March 30, the IWW issued another press release stating that "[c]ustomers have a right to know that their sandwich could be filled with germs,"

that IWW members have a duty to speak out on this "public health issue," and that employees "blew the whistle by posting 3000 copies of a poster advising the public of health risks at the sandwich chain." The release quoted one employee as stating: "The unfettered greed of franchise owner Mike Mulligan and Jimmy John Liautaud himself jeopardizes the health of thousands of customers and workers almost every day. We will speak out until they realize that no one wants to eat a sandwich filled with cold and flu germs."

**B. The NLRB Proceedings.** Following a two-day evidentiary hearing, the Board's Administrative Law Judge ("ALJ") concluded that MikLin violated Sections 8(a)(1) and 8(a)(3) of the Act. Citing prior Board decisions, the ALJ ruled that "Section 7 [29 U.S.C. § 157] protects employee communications to the public that are part of and related to an ongoing labor dispute," such as the Sick Day posters and related press releases, unless they are "so disloyal, reckless, or maliciously untrue as to lose the Act's protections." To lose Section 7 protection, "an employee's public criticism . . . must evidence 'a malicious motive'" or be made with knowledge of the statements' falsity or with reckless disregard for their truth or falsity.

The ALJ found that the Sick Day posters were not maliciously untrue. While "it is not literally true that employees could not call in sick," the ALJ observed, employees "are subject to discipline if they call in sick without finding a replacement." Thus, the assertion, "SHOOT, WE CAN'T EVEN CALL IN SICK," was "protected hyperbole." The ALJ acknowledged record evidence that MikLin had served more than six million sandwiches over its ten-year existence and had been investigated by the Minnesota Department of Health only two times for food borne disease -- once in 2006 and once in 2007, when the investigating sanitarian "noted overall compliance with food code requirements and no critical violations." The ALJ found, however, "it is at least arguable that [MikLin's] sick leave policy subjects the public to an increased risk of food borne disease," and MikLin "could have waged its own publicity campaign" to attract consumers. The ALJ made no mention of the false

assertion in the open letter accompanying the IWW press release that health code violations occurred at MikLin stores nearly every day. Nor did the ALJ even attempt to analyze and apply the disloyalty principle of Jefferson Standard.

A divided panel of the Board affirmed the ALJ's findings and conclusions. MikLin Enters., Inc., 361 N.L.R.B. No. 27, at *7 (2014). The majority concluded "that neither the posters nor the press release were shown to be so disloyal, reckless, or maliciously untrue as to lose the Act's protection." The public communications "were clearly related to the ongoing labor dispute concerning the employees' desire for paid sick leave. . . . Indeed, any person viewing the posters and press release would reasonably understand that the motive for the communications was to garner support for the campaign to improve the employees' terms and conditions of employment by obtaining paid sick leave rather than to disparage [MikLin] or its product." Nor were any of the statements maliciously untrue.

Turning to the question of disloyalty, the majority noted that "Board law has developed considerably in its approach to the question of employee disloyalty." "To lose the Act's protection as an act of disloyalty, an employee's public criticism of an employer must evidence a malicious motive," even if the public communication "raise[s] highly sensitive issues such as public safety." Accepting the majority's summary of prior Board decisions, the dissenting Member would nonetheless have held the Sick Day posters and press release unprotected, because "it is well established that employees lose the Act's protection if their means of protest are 'flagrantly disloyal, wholly incommensurate with any grievances which they may have, and manifested by public disparagement of the employer's product or undermining of its reputation,'" quoting Five Star Transportation, Inc., 349 N.L.R.B. 42, 44-47 (2007), enforced, 522 F.3d 46 (1st Cir. 2008).

## II. "Sick Day" Poster Issues.

It is well established that an employer commits an unfair labor practice if it discharges employees for engaging in concerted activities that are protected by Section 7 of the NLRA, including communications to third parties or to the public that seek to "improve their lot as employees through channels outside the immediate employee-employer relationship." Eastex, Inc. v. NLRB, 437 U.S. 556, 565 (1978). Section 10(c) of the Act, however, expressly limits the Board's broad authority to remedy unlawful employee discharges: "No order of the Board shall require the reinstatement of any individual as an employee . . . if such individual was suspended or discharged for cause." 29 U.S.C. § 160(c). The interplay between Section 7 and Section 10(c) was the critical question the Supreme Court addressed in Jefferson Standard.

**A.** In Jefferson Standard, the Court upheld the Board's decision that a broadcasting station did not violate the Act when it fired technicians who distributed handbills "making a sharp, public, disparaging attack upon the quality of the company's product and its business policies, in a manner reasonably calculated to harm the company's reputation and reduce its income." 346 U.S. at 471. After bargaining negotiations broke down, employees first picketed the station for treating its employees unfairly. When this tactic failed, the employees distributed thousands of handbills, signed "WBT Technicians," criticizing the station's poor programming quality and asserting that Jefferson Standard did not value its customers and considered the local city to be a "second-class community." Id. at 468. The Board found the employee handbills unprotected because the technicians "deliberately undertook to alienate their employer's customers by impugning the technical quality of his product." Jefferson Standard Broadcasting Co., 94 N.L.R.B. 1507, 1511 (1951). Though the technicians' purpose was "to extract a concession from the employer with respect to the terms of their employment," the Board found that they lost the Act's protection when they failed to disclose their interests as employees. Id.

at 1511. The Board reasoned that the technicians lost the Act's protection because "the gist of [the technicians'] appeal to the public was that the employer ought to be boycotted because he offered a shoddy product to the consuming public -- not because he was 'unfair' to the employees who worked on that product." Id. at 1512. The Board declined to decide whether the product disparagement in the handbills would justify discharge "had it been uttered in the context of a conventional appeal for support of the union in the labor dispute." Id. at 1512 n.18.

The Supreme Court, in affirming the Board, decided the case on broader grounds. After quoting the "for cause" language of Section 10(c), the Court declared that "[t]here is no more elemental cause for discharge of an employee than disloyalty to his employer." Jefferson Standard, 346 U.S. at 472. Congress in the NLRA "did not weaken the underlying contractual bonds and loyalties of employer and employee." Id. at 473. Absent a labor controversy, the technicians' conduct "unquestionably would have provided adequate cause for their disciplinary discharge within the meaning of § 10(c). . . . The fortuity of the coexistence of a labor dispute affords these technicians no substantial defense." Id. at 476. Thus, the handbill attack targeting "the quality of the company's product . . . was as adequate a cause for the discharge of its sponsors as if the labor controversy had not been pending." Id. at 477. Though the Court noted several times that the technicians failed to disclose a connection between their labor dispute and the handbill attack, the Court declined to remand for further consideration of whether the handbills were an "appeal for support in the pending dispute," rather than "a concerted separable attack," because the attack would be unprotected either way:

> Even if the attack were to be treated, as the Board has not treated it, as a concerted activity wholly or partly within the scope of those mentioned in § 7, the means used by the technicians in conducting the attack have deprived the attackers of the protection of that section, when read in the light and context of the purpose of the Act.

-10-

Id. at 477-78.

The Supreme Court's decision not to remand in Jefferson Standard made clear that the Court's disloyalty ruling includes communications that otherwise would fall within Section 7 protection, if those communications "mak[e] a sharp, public, disparaging attack upon the quality of the company's product and its business policies, in a manner reasonably calculated to harm the company's reputation and reduce its income." 346 U.S. at 471. In NLRB v. Washington Aluminum Co., 370 U.S. 9, 17 (1962), the Court confirmed that Section 10(c) "cannot mean that an employer is at liberty to punish a man by discharging him for engaging in concerted activities which § 7 of the Act protects." But the Court explained that Jefferson Standard "denied the protection of § 7 to activities characterized as 'indefensible' because they were there found to show a disloyalty to the workers' employer which [the] Court deemed unnecessary to carry on the workers' legitimate concerted activities." Id., quoting Jefferson Standard, 346 U.S. at 477. Thus, we reject the dissent's suggestion that Jefferson Standard does not apply in this case because the employees' disparaging communications "expressly reference[d] ongoing labor disputes." *Post* at 31.[1]

**B.** Board decisions applying Jefferson Standard initially recognized that employers may protect their businesses from detrimental product disparagement whether or not an employee attack referenced a labor dispute. See Patterson-Sargent Co., 115 N.L.R.B. 1627, 1630 (1956) (employees' handbill asserting replacement workers produced defective paint was unprotected "public disparagement of the quality of the employer's product"); Coca Cola Bottling Works, Inc., 186 N.L.R.B. 1050, 1063-64 (1970) (employees' leaflet warning that inexperienced workers could

---

[1]On this issue, we disagree with the contrary conclusion of the panel majority in DirecTV, Inc. v. NLRB, 837 F.3d 25, 35-36 (D.C. Cir. 2016).

leave objects such as roaches, bugs, and dead mice in the company's bottles was "the very type of [disparaging] conduct" held unprotected in Jefferson Standard).

Though the Supreme Court's interpretation of the NLRA in Jefferson Standard remains unchanged, "Board law has developed considerably in its approach to the question of employee disloyalty." MikLin, 361 N.L.R.B. No. 27, at *5 n.18. In 1987, the Board articulated its modern interpretation: "Jefferson Standard held that employees may engage in communications with third parties in circumstances where the communication is related to an ongoing labor dispute and when the communication is not so disloyal, reckless, or maliciously untrue to lose the Act's protection." Emarco, Inc., 284 N.L.R.B. 832, 833 (1987); see Am. Golf Corp., 330 N.L.R.B. 1238, 1240 (2000). Although Jefferson Standard did not involve employee public communications that were reckless or maliciously untrue, we do not question the Board's view that such communications are not entitled to the protection of Section 7 as limited by Section 10(c).[2] Indeed, we applied that standard in St. Luke's Episcopal-Presbyterian Hosp. v. NLRB, 268 F.3d 575, 580 (8th Cir. 2001), citing Montefiore Hosp., 621 F.2d at 517.

The issue in this case is the Jefferson Standard disloyalty principle -- Section 10(c) permits an employer to fire an employee for "making a sharp, public, disparaging attack upon the quality of the company's product and its business

---

[2]To be unprotected on this ground, employee public statements must be "made with knowledge of their falsity or with reckless disregard for their truth or falsity." MikLin, 361 N.L.R.B. No. 27, at *3 (quotation omitted). This standard derives from the Supreme Court's decision in Linn v. United Plant Guard Workers of Am., Local 114, 383 U.S. 53, 64-65 (1966), that statements made during a union representation campaign can be grounds for a state law libel action only if the plaintiff meets the "actual malice" standard adopted in First Amendment libel cases. Linn did not address the distinct issue of employee public disparagement of an employer or its products and services. Nothing in Jefferson Standard suggests disloyalty, to be unprotected, requires proof of actual malice.

policies, in a manner reasonably calculated to harm the company's reputation and reduce its income." 346 U.S. at 471. On this issue, while always purporting to apply Jefferson Standard's holding, the Board has migrated to a severely constrained interpretation of that decision. "To lose the Act's protection as an act of disloyalty, an employee's public criticism of an employer must evidence a malicious motive." MikLin, 361 N.L.R.B. No. 27, at *5 (quotation omitted). "[E]ven communications that raise highly sensitive issues such as public safety [are] protected where they are sufficiently linked to a legitimate labor dispute and are not maliciously motivated to harm the employer." Id. at *4-*5.

In our view, the Board fundamentally misconstrued Jefferson Standard in two ways. First, while an employee's subjective intent is of course relevant to the disloyalty inquiry -- "sharp, public, disparaging attack" suggests an intent to harm -- the Jefferson Standard principle includes an objective component that focuses, not on the employee's *purpose*, but on the *means* used -- whether the disparaging attack was "reasonably calculated to harm the company's reputation and reduce its income," 346 U.S. at 471, to such an extent that it was harmful, indefensible disparagement of the employer or its product, id. at 477. By holding that *no* act of employee disparagement is unprotected disloyalty unless it is "maliciously motivated to harm the employer," the Board has not interpreted Jefferson Standard -- it has overruled it.[3]

Second, the Board's definition of "malicious motive" for these purposes excludes from Jefferson Standard's interpretation of Section 10(c) all employee disparagement that is part of or directly related to an ongoing labor dispute. While the employees "may have anticipated that some members of the public might choose

---

[3]Of course, if employees actually harbor an intent to harm their employer's business for improper motives, their conduct falls outside the protection Section 7 affords. See NLRB v. Red Top, Inc., 455 F.2d 721, 725-26 (8th Cir. 1972). But the Board's leap from the relevance of motive to a required finding of "malicious motive" is contrary to the Court's analysis in Jefferson Standard.

-13-

not to patronize [MikLin's] restaurants after reading the posters or press release," the Board ruled, their public communications were protected activity because "there is no evidence that [their] purpose was to inflict harm on [MikLin]." Rather, "they were motivated by a sincere desire to improve their terms and conditions of employment." MikLin, 361 N.L.R.B. No. 27, at *6. In other words, the Board refuses to treat as "disloyal" any public communication intended to advance employees' aims in a labor dispute, regardless of the manner in which, and the extent to which, it harms the employer. As the Court held in Jefferson Standard that its disloyalty principle would apply even if the employees had explicitly related their public disparagement to their ongoing labor dispute, once again the Board has not interpreted Jefferson Standard -- it has overruled it.

By requiring an employer to show that employees had a subjective intent to harm, and burdening that requirement with an overly restrictive need to show "malicious motive," the Board has effectively removed from the Jefferson Standard inquiry the central Section 10(c) issue as defined by the Supreme Court -- whether the means used reflect indefensible employee disloyalty. This is an error of law. See George A. Hormel & Co. v. NLRB, 962 F.2d 1061, 1065 (D.C. Cir. 1992). Our prior cases confirm that an employee's disloyal statements can lose Section 7 protection without a showing of actual malice. In St. Luke's, we expressly rejected the contention that public disparagement of an employer "was protected activity unless maliciously false." 268 F.3d at 579. We explained that cases interpreting Jefferson Standard "establish that an employee exceeds the boundaries of protected activity when she falsely and publicly disparages her employer or its products and services." Id. at 580. By requiring proof that disloyal conduct was the product of a malicious motive, the Board fundamentally misinterpreted both Jefferson Standard and our decisions construing and applying Jefferson Standard.

Rather than employee motive, the critical question in the Jefferson Standard disloyalty inquiry is whether employee public communications reasonably targeted

-14-

the employer's labor practices, or indefensibly disparaged the quality of the employer's product or services.  The former furthers the policy of the NLRA; the latter does not.  See Jefferson Standard, 346 U.S. at 476; see also Five Star, 349 N.L.R.B. at 46.  This distinction focuses on the type of harm employees' methods cause.  When employees convince customers not to patronize an employer because its labor practices are unfair, subsequent settlement of the labor dispute brings the customers back, to the benefit of both employer and employee.  By contrast, sharply disparaging the employer's product or services as unsafe, unhealthy, or of shoddy quality causes harm that outlasts the labor dispute, to the detriment of all employees as well as the employer.  See Diamond Walnut Growers, Inc. v. NLRB, 113 F.3d 1259, 1267 (D.C. Cir. 1997) (en banc), cert. denied, 523 U.S. 1020 (1998); compare Montefiore, 621 F.2d at 517 (efforts by striking doctors to discourage patients from entering the clinic were unprotected, although related to labor dispute, because they "appealed to patients to turn away not out of sympathy with the aims of the striking workers . . . , but in the belief that they could not obtain competent treatment there"), and St. Luke's, 268 F.3d at 580 (nurse's public statements relating to ongoing labor dispute were unprotected because she "disparaged the quality of patient care being provided by [her employer] in a way guaranteed to adversely affect the hospital's reputation with prospective patients and the public at large"), with NLRB v. Greyhound Lines, Inc., 660 F.2d 354, 357 (8th Cir. 1981) (bus drivers' factual statements regarding anticipated service delays were not unprotected because they "did not contain any insults or negative insinuations about the Company's services or integrity with respect to its customers").[4]

**C.** The Board argues, and our dissenting colleagues agree, that its decision is entitled to judicial deference under Chevron, U.S.A., Inc. v. Nat. Res. Def. Council,

---

[4]The Board did not cite Diamond Walnut Growers or St. Luke's, the most relevant circuit court authorities.  It dismissed Coca Cola as Board precedent that "has been implicitly overruled."  MikLin, 361 N.L.R.B. No. 27, at *5 n.18.

Inc., 467 U.S. 837 (1984). It is certainly well established that "the task of defining the scope of § 7 is for the Board to perform in the first instance as it considers the wide variety of cases that come before it." NLRB v. City Disposal Sys., Inc., 465 U.S. 822, 829 (1984) (quotation omitted). But the dissent argues for far greater Board autonomy, relying on the statement in National Cable & Telecommunications Ass'n v. Brand X Internet Services, 545 U.S. 967, 982 (2005), that a prior court of appeals "construction of a statute trumps an agency construction otherwise entitled to Chevron deference only if the prior court decision holds that its construction follows from the *unambiguous* terms of the statute and thus leaves no room for agency discretion." This principle, if applied literally here, would leave the Board free to disregard any prior Supreme Court or court of appeals interpretation of the NLRA. We reject this contention because it is contrary to eighty years of Supreme Court decisions reviewing the Board's interpretations of this heavily litigated statute.

In the first place, we doubt the statement in Brand X even applies in this case, where the Board itself purported to interpret Jefferson Standard, not apply its own contrary interpretation of the proper interplay between Section 7 and Section 10(c) of the NLRA: "In protecting employee communications that are critical of the employer or its product where the communications relate to a labor dispute, the Board has adhered to the specific holding of Jefferson Standard, . . . and its approach has been upheld by numerous courts." MikLin, 361 N.L.R.B. No. 27, at \*5. Brand X does not require a court to defer to an agency's interpretations of judicial precedent. Numerous prior court of appeals decisions have held that the Board's interpretation of judicial precedent "is not entitled to judicial deference." N.Y., N.Y., LLC v. NLRB, 313 F.3d 585, 590 (D.C. Cir. 2002); accord Ne. Beverage Corp. v. NLRB, 554 F.3d 133, 139 (D.C. Cir. 2009); NLRB v. U.S. Postal Serv., 660 F.3d 65, 68 (1st Cir. 2011); see Owen v. Bristol Care, Inc., 702 F.3d 1050, 1054 (8th Cir. 2013). Applying these precedents, we interpret Jefferson Standard *de novo*.

Second, it is far from settled that <u>Brand X</u> applies to prior decisions of the Supreme Court such as <u>Jefferson Standard</u>. <u>See</u> <u>Brand X</u>, 545 U.S. at 1003 (Stevens, J., concurring) (agency freedom to reject judicial interpretation of an ambiguous statute "would not necessarily be applicable to a decision by this Court that would presumably remove any pre-existing ambiguity"); <u>United States v. Home Concrete & Supply, LLC</u>, 132 S. Ct. 1836, 1851-52 (2012) (Kennedy, J., dissenting). In <u>Home Concrete</u>, the Court was badly fractured on the issue of how to apply the broad agency deference statement in <u>Brand X</u>; no position commanded a majority.

Third, the Court in <u>Chevron</u> recognized that statutory construction is first and foremost a judicial function: "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." 467 U.S. at 843 n.9. Consistent with this principle, in reviewing Board decisions under the NLRA, the Supreme Court has more than once applied the principle that, "[o]nce we have determined a statute's clear meaning, we adhere to that determination under the doctrine of stare decisis, and we judge an agency's later interpretation of the statute against our prior determination of the statute's meaning." <u>Lechmere, Inc. v. NLRB</u>, 502 U.S. 527, 536 (1992), quoting <u>Maislin Ind., U.S., Inc. v. Primary Steel, Inc.</u>, 497 U.S. 116, 131 (1990); <u>accord</u> <u>Neal v. United States</u>, 516 U.S. 284, 295 (1996). In <u>Lechmere</u>, the Court declined to enforce a Board interpretation of Section 7 that "erode[d]" the general rule adopted by the Court in a prior case. <u>Brand X</u> cited <u>Lechmere</u> favorably. 545 U.S. at 984. Likewise, in <u>NLRB v. Int'l Longshoremen's Ass'n</u>, 473 U.S. 61, 78, 80 (1985), the Court noted it was "mindful of the rule that the Board's construction of the Act is due our deference," but it denied enforcement of the Board's order because "the Board misconstrued our cases in suggesting that 'eliminated' work can never be the object of a work preservation agreement." These decisions clearly preclude the Board from construing <u>Jefferson Standard</u> in a manner that fundamentally erodes a disloyalty principle that determined the clear meaning of Section 10(c).

Finally, it is important to recall that in <u>Jefferson Standard</u> the Court went beyond the Board's ruling, based on Section 7, and defined the interplay between Section 7 and Section 10(c) of the Act. The Court noted that Section 10(c), part of the Labor Management Relations Act of 1947, commonly known as the Taft-Hartley Act, amended Section 10(c) so as to limit the Board's authority to interfere with an employer's right to discharge employees "for cause." 346 U.S. at 473-74, quoting H.R. Rep. No. 510 , 80th Cong., 1st Sess. 38-39. In a subsequent decision, the Court noted that Congress designed Section 10(c) "to preclude the Board from reinstating an individual who had been discharged for misconduct," quoting legislative history stating that the provision was "intended to put an end to the belief, now widely held and certainly justified by the Board's decisions, that engaging in union activities carries with it a license to loaf, wander about the plants, refuse to work, waste time, break rules, and engage in incivilities and other disorders and misconduct." <u>Fibreboard Paper Prods. Corp. v. NLRB</u>, 379 U.S. 203, 217 n.11 (1964), quoting H.R. Rep. No. 245, 80th Cong., 1st Sess., 42 (1947). <u>Chevron</u> deference must be based on the intent of Congress. We see no basis for concluding that Congress intended that courts defer when the Board narrowly construes a Supreme Court opinion that established the meaning of a statute intended to *limit* the Board's authority.

**D.** Turning to the merits of this case, we review the Board's factual findings for "substantial evidence on the record as a whole." <u>Cellular Sales of Mo., LLC v. NLRB</u>, 824 F.3d 772, 775 (8th Cir. 2016) (quotation omitted). Substantial evidence supports the Board's findings that the employees' Sick Day posters and press releases were related to their protected concerted effort to improve the terms and conditions of their employ by obtaining paid sick leave. Communications asking the public to support this effort may be within the protection of Section 7 even though they address a sensitive issue, like sick leave in the food service industry. Delineating the boundaries of "indefensible" third-party communications is more difficult when this connection is present. But as a matter of law, the Board erred in concluding that the employees' product disparagement was protected Section 7 activity simply because

its purpose was to obtain paid sick days. Even communications connected to a labor dispute are unprotected when they constitute a "sharp, public, disparaging attack upon the quality of the company's product and its business policies." Jefferson Standard, 346 U.S. at 471.

The attack was "sharp," proceeding "in a manner reasonably calculated to harm the company's reputation and reduce its income." Id. at 471. The posters, press releases, and letter were an effective campaign to convince customers that eating Jimmy John's sandwiches might cause them to become sick. The Sick Day poster warned that the reader was "about to take the sandwich test." Its enduring image was a MikLin-made Jimmy John's sandwich that, although appearing like any other, was filled with cold and flu germs. As in Jefferson Standard, the employees were not on strike, but continued to work and collect wages as they attempted to scare customers away from their employer and its products. "Nothing could be further from the purpose of the Act than to require an employer to finance such activities." Jefferson Standard, 346 U.S. at 476.

Allegations that a food industry employer is selling unhealthy food are likely to have a devastating impact on its business, what the D.C. Circuit called the "equivalent of a nuclear bomb" in a labor-relations dispute. Diamond Walnut Growers, 113 F.3d at 1267. MikLin's employees maximized this effect, choosing March as a "good time" to launch their attack "because it was flu season."[5] The employees understood that MikLin's business was dependent on its "clean" public

---

[5] The Board majority emphasized "there is no evidence that the communications were made 'at a critical time in the *initiation*' of [MikLin's] business," a fact present in Jefferson Standard. MikLin, 361 N.L.R.B. No. 27, at *6 (emphasis added). Either the Board was limiting Jefferson Standard to its facts -- a clear error of law -- or its interpretation of the evidence in this case was simply disingenuous. Employees' conscious decision to scare MikLin customers during flu season was strong evidence of their intent to disparage MikLin "at a critical time."

image, yet directly attacked that image. Like the technicians in <u>Jefferson Standard</u>, the MikLin employees accused their employer of not valuing its customers. <u>See</u> <u>Montefiore Hosp.</u>, 621 F.2d at 517; <u>Five Star</u>, 349 N.L.R.B. at 46. By targeting the food product itself, employees disparaged MikLin in a manner likely to outlive, and also unnecessary to aid, the labor dispute. Even if MikLin granted paid sick leave, the image of contaminated sandwiches made by employees who chose to work while sick was not one that would easily dissipate.

The employees' public claims about their employer's product were also "materially false and misleading." <u>St. Luke's</u>, 268 F.3d at 581. The Sick Day poster graphically told customers that sandwich makers were working when sick by falsely stating, "Shoot, we can't even call in sick." The press release and open letter claimed that MikLin jeopardized customers' health by the almost daily health code violations occurring at MikLin's stores. Yet the IWW supporters knew MikLin complied with Minnesota Department of Health regulations by requiring employees to call in sick if they had experienced flu-like symptoms in the last 24 hours. As the ALJ noted: "Given [MikLin's] record over a 10-year period one could regard the risk of becoming ill by eating at one of [its] shops to be infinitesimal." <u>MikLin</u>, 361 N.L.R.B. No. 27, at *23. This factor made the MikLin employees' attack even more "indefensible" than that at issue in <u>Jefferson Standard</u>, where the technicians "did not misrepresent, at least willfully, the facts they cited to support their disparaging report." 346 U.S. at 472. As dissenting Board Member Johnson stated, "Any employee who is willing to make up allegations out of whole cloth against his or her employer is obviously far more disloyal, in any meaningful sense of that word, than one who acts upon a reasonable but mistaken belief." <u>MikLin</u>, 361 N.L.R.B. No. 27, at *12 (Johnson, M., dissenting in part).

From the array of possible tactics, the employees selected public communications that were sure "to harm [MikLin's] reputation and reduce its income." <u>Jefferson Standard</u>, 346 U.S. at 471. This was a "continuing attack . . .

upon the very interests which the attackers were being paid to conserve and develop." 346 U.S. at 476. The Act does not protect such calculated, devastating attacks upon an employer's reputation and products. See Endicott Interconnect Techs., Inc. v. NLRB, 453 F.3d 532, 537 (D.C. Cir. 2006). Although applying Jefferson Standard's disloyalty principle is often difficult, the employees' third-party communications demonstrated "such detrimental disloyalty as to provide 'cause'" for MikLin to discharge and discipline those responsible for the campaign. 346 U.S. at 472. We decline to enforce the Board's contrary Order.

**E.** After learning that IWW supporters were about to "plaster" the area surrounding MikLin stores with Sick Day posters, Robert Mulligan posted this message on an employee-created "Jimmy John's Anti-Union" Facebook page:

> . . . [T]he IWW are threatening to put up thousands of posters that threaten our business and your jobs. They plan on doing this if we don't meet with them which we will not do. I encourage anyone to take down any posters they may see around the twin cities. These posters are defamatory.

The ALJ concluded this post violated Section 8(a)(1) because its target, the sandwich posters, was concerted activity protected by Section 7. The Board affirmed the ALJ, one member dissenting. Section 8(a)(1) forbids employers to "interfere with, restrain, or coerce" employees in the exercise of their Section 7 rights. Because we conclude the posters were not protected Section 7 activity, substantial evidence does not support the Board's decision. Soliciting employees to remove unprotected public communications did not "interfere with, restrain or coerce" employees in their exercise of Section 7 rights. We decline to enforce this portion of the Board's Order.

-21-

## III. Other Issues.

MikLin also appeals the Board's conclusion that it committed two other violations of Section 8(a)(1) during the IWW's organizing campaign in late 2010 and early 2011. "We will enforce the Board's order as long as the Board correctly applied the law, and its findings are supported by substantial evidence, even if we might have reached a different decision on de novo review." NLRB v. Rockline Indus., Inc., 412 F.3d 962, 966 (8th Cir. 2005). The panel unanimously enforced these portions of the Board's Order. We agree.

**A. Facebook Postings by MikLin Supervisors.** In response to the IWW's public organizing campaign, a rank-and-file MikLin employee created the "Jimmy John's Anti-Union" Facebook page. Its membership grew to include Robert Mulligan, MikLin managers, and other employees who opposed the IWW. The Facebook page was open to viewing by anyone with a Facebook account, including IWW supporters and neutral employees.

Rene Nichols was assistant manager of the MikLin store where IWW-supporter David Boehnke worked. Nichols posted on the Facebook page listing Boehnke's telephone number and suggesting that employees text Boehnke to "let him know how they feel," followed by the comment, "Fuck You David! Forever." When a former MikLin employee posted a picture on the Facebook page showing Boehnke with feces on the brim of his hat and the IWW logo on his shirt, and displaying the words "Shithead" and "Liar" and a toilet bowl in the background, Nichols commented, "Haaaa Ben--2 David--0 Fartbag." Two other MikLin managers, Eddie Guerrero and Melissa Erickson, posted that the photo should be posted everywhere.

The ALJ ruled that Nichols's posts violated Section 8(a)(1) by encouraging employees to harass Boehnke for protected activities. The Board affirmed that ruling and also ruled that managers Guerrero and Erickson violated Section 8(a)(1) by

encouraging employees to disparage a union supporter. The Board found that Nichols's posts, and the Guerrero and Erickson posts encouraging other employees to widely disseminate a degrading picture of an employee leader of the IWW, "would reasonably intimidate both Boehnke and other employees who would not want to be subject to the same kind of humiliation and ridicule, thereby dissuading them from supporting the Union." MikLin, 361 N.L.R.B. No. 27, at *8.

Section 8(c) of the Act provides that "[t]he expressing of any views, argument, or opinion . . . shall not constitute or be evidence of an unfair labor practice . . . if such expression contains no threat of reprisal or force or promise of benefit." "Accordingly, to violate Section 8(a)(1), a statement must contain a threat of reprisal or force or promise of benefit." Greater Omaha Packing Co. v. NLRB, 790 F.3d 816, 822 (8th Cir. 2015). "Words of disparagement alone concerning a union or its officials are insufficient for finding a violation of Section 8(a)(1)." Sears, Roebuck & Co., 305 N.L.R.B. 193, 193 (1991). However, an employer's ridicule of union supporters in front of other employees may violate Section 8(a)(1) where it is likely to discourage employees from exercising their Section 7 rights. See Dayton Hudson Corp., 316 N.L.R.B. 477, 483 (1995).

We conclude that substantial evidence supports the Board's conclusion that the supervisors' public effort to disparage and degrade union leader Boehnke restrained or coerced MikLin employees in the exercise of their Section 7 rights, by causing other employees to fear they would incur similar treatment if they supported the IWW. Though we now hold that MikLin lawfully terminated Boehnke prior to most of these posts for his role in the Sick Day poster attack, the degrading posts targeted Boehnke for his general support of the IWW and thus coerced other employees not to engage in protected activity. We enforce this portion of the Board's Order.

**B. Removal of In-Store Union Literature.** After the IWW lost the representation election, it filed unfair labor practice charges and objections to the

election with the Board. The parties settled this dispute with a Board-approved "Stipulation to Set Aside Election" in which they agreed that the October 2010 election was set aside and the IWW could request a "Rerun Election." The settlement included a provision that MikLin "does not admit to violating the National Labor Relations Act as alleged, and approval by the Regional Director does not constitute a determination that [MikLin] has violated the Act."

At the evidentiary hearing, pro-union employee Travis Erickson testified that, after the settlement, MikLin posted on the employee "tack board" in the back of the store where Erickson worked the Notice to Employees required by the Stipulation and a posting giving MikLin's "explanation to employees of what the settlement meant." In response, Erickson posted on the same board an IWW "FAQ about the Union Election & Settlement," giving the union's position on these issues, and a copy of the amended unfair labor practice charges the IWW had filed with the Board. Erickson testified that these postings were repeatedly removed before he came to work, and one set had been smeared with grease pen marks. Erickson and three other union supporters eventually confronted area manager Jason Effertz, who admitted taking down the posts and said "our lawyers told us to take them down." Effertz later told Erickson, "You guys can put up anything you want about who you are and what you stand for, but you're not allowed to put up stuff talking about the election." MikLin introduced no evidence contradicting this testimony.

The ALJ concluded that removal of the union materials violated Section 8(a)(1). The Board affirmed. On appeal, MikLin argues it had the right to prohibit this union literature because statements on the FAQ notice "were materially false representations of events, processes and outcomes of past NLRB proceedings, and were intended to undermine the authority of management," citing Eastex, 437 U.S. at 70-73 .

Section 8(a)(1) makes it an unfair labor practice for an employer to "interfere with" employees in the exercise of their Section 7 rights, which include the right "to bargain collectively through representatives of their own choosing." As the Supreme Court said in Central Hardware Co. v. NLRB, 407 U.S. 539, 542-43 (1972), the right of self-organization

> includes both the right of union officials to discuss organization with employees, and the right of employees to discuss organization among themselves. . . . But organization rights are not viable in a vacuum; their effectiveness depends in some measure on the ability of employees to learn the advantages and disadvantages of organization from others.

"The inquiry under § 8(a)(1) is an objective one which asks whether, considering the entire factual context, the employer's conduct reasonably tends to interfere with the employees' exercise of their section 7 rights." Mississippi Transp., Inc. v. NLRB, 33 F.3d 972, 977-78 (8th Cir. 1994).

Here, some MikLin employees engaged in a concerted organizing campaign that resulted in a contested election followed by the filing of unfair labor practice charges and election objections that were settled by a Board-approved Stipulation authorizing a Rerun Election. The record contains undisputed testimony that MikLin posted its explanation of these NLRB proceedings on employee "tack boards" in the back of its stores and then removed the IWW's responsive FAQ notice, explaining that "[y]ou guys can put up anything you want about who you are and what you stand for, but you're not allowed to put up stuff talking about the election." A more clear-cut case of interfering with the employees' Section 7 right to effectively communicate about their ongoing organizational activity is hard to imagine. While employees have no statutory right to use their employer's bulletin boards, "where by policy or practice, the company permits employee access to bulletin boards for any purpose, section 7 . . . secures the employees' right to post union materials." Roadway Exp., Inc. v. NLRB, 831 F.2d 1285, 1290 (6th Cir. 1987); see Healthbridge Mgmt., LLC

v. NLRB, 798 F.3d 1059, 1073 (D.C. Cir. 2015); NLRB v. Honeywell, Inc., 722 F.2d 405, 406-07 (8th Cir. 1983).

MikLin introduced no evidence supporting its implausible contention that removal of an IWW flyer that gave employees the union's contrary interpretation of the NLRB proceedings was necessary to maintain the "authority of management." Therefore, substantial evidence supports the Board's conclusion that removal of the flyers and copies of the IWW amended charge violated Section 8(a)(1) of the Act. We enforce this portion of the Board's Order.

## IV. Conclusion.

For the foregoing reasons, we grant enforcement of the Board's Decision and Order except as to paragraphs 4, 5, and 6 of the Amended Conclusions of Law and paragraphs 1(d), 1(e), and 2(a)-(g) of the Order. We note that, after we enforced its order in part in Greater Omaha, the Board filed a proposed form of judgment, which we entered when the company filed no objection. 790 F.3d at 825-28. We leave to the parties whether to follow that procedure in this case.

COLLOTON, Circuit Judge, with whom BENTON, Circuit Judge, joins, concurring in the judgment.

As this case comes to us, MikLin Enterprises, Inc., does not challenge the standard applied by the National Labor Relations Board to determine whether concerted activities of an employee are so disloyal as to lose protection under Section 7 of the National Labor Relations Act. The company's position, rather, is that the Board's decision applying its standard in this case was unsupported by substantial evidence. I conclude that MikLin's argument has merit and therefore concur in the judgment.

-26-

The Board has interpreted the Act to mean that employee communications to third parties are unprotected by the Act if they are "flagrantly disloyal, wholly incommensurate with any grievance which [the employees] might have." *Valley Hosp. Med. Ctr.*, 351 N.L.R.B. 1250, 1260 (2007) (quotation omitted). According to the Board, "[t]o lose the Act's protection as an act of disloyalty, an employee's public criticism of an employer must evidence a malicious motive." *Id.* at 1252 (internal quotation omitted). The Board has explained that disparaging comments are unprotected when they are "calculated to alienate the public's patronage as a tactic to increase the employees' leverage in [a] labor dispute." *Richboro Cmty. Mental Health Council*, 242 N.L.R.B. 1267, 1268 (1979). In this case, the Board concluded that "[w]hile the employees may have anticipated that some members of the public might choose not to patronize [MikLin's] restaurants after reading the posters or press release, there is no evidence that their purpose was to inflict harm on [MikLin], or that they acted recklessly without regard for the economic detriment to [MikLin's] business." *MikLin Enters., Inc.*, 361 N.L.R.B. No. 27, at *7 (2014).

In my view, the Board's conclusion blinks reality. The employees obviously intended to harm MikLin's business: "[T]he main thrust of the contaminated-sandwich posters is to shock the public and create a generalized fear that consuming MikLin's sandwiches will cause illness." *Id.* at *12 (Johnson, M., dissenting in part). The majority opinion explains why the evidence compels a conclusion that the employees acted with malicious motive. The employees intentionally "cho[se] March as a 'good time' to launch their attack 'because it was flu season.'" *Ante*, at 19. The posters, press release, and open letter included materially false and misleading statements implying that sandwich makers were working while sick in violation of the state health code. *Id*. at 20. "From the array of possible tactics, the employees selected public communications that were sure to harm [MikLin's] reputation and reduce its income." *Id*. (internal quotation omitted). The "[e]mployees' conscious decision to scare MikLin customers during flu season was strong evidence of their intent to disparage MikLin 'at a critical time.'" *Id*. at 19 n.5 (emphasis added).

-27-

The substantial evidence standard of review affords the Board leeway in choosing between two fairly conflicting views of the evidence, but there are limits. *See Endicott Interconnect Techs., Inc. v. NLRB*, 453 F.3d 532, 537 (D.C. Cir. 2006). The record here allows only one reasonable conclusion—that the MikLin employees acted with malicious motive in a manner that was flagrantly disloyal, wholly incommensurate with any grievance. In the Board's words from *Richboro*, the disparagement included in the posters and press release plainly was "calculated to alienate the public's patronage as a tactic to increase the employees' leverage in the labor dispute." 242 N.L.R.B. at 1268. I therefore concur in the judgment granting enforcement of the Board's Decision and Order, but declining to enforce paragraphs 4, 5, and 6 of the Amended Conclusions of Law and paragraphs 1(d), 1(e), and 2(a)-(g) of the Order. Although I do not join Part II of the majority opinion, I agree with Part III concerning other issues raised in the petition for review.

KELLY, Circuit Judge, with whom MURPHY, Circuit Judge, joins, dissenting in part.

I respectfully dissent from Part II of the court's opinion.

## A.

In 1953, the Supreme Court in Jefferson Standard created an exception from protection under Section 7 of the Act, introducing the concept that employees could be discharged "for cause" under Section 10(c) if they engaged in "disloyalty." The court here concludes that Jefferson Standard set out an explicit test for determining disloyalty and asserts that the Board made an "error of law" by failing to apply the test properly. But Jefferson Standard did not set out a test to apply to determine whether an employer's "cause for discharge" was "disloyalty to his employer." 346 U.S. at 472; see id. at 481 (Frankfurter, J. dissenting) ("The Board and the courts of appeals will hardly find guidance for future cases from this Court's reversal of the

-28-

Court of Appeals, beyond that which the specific facts of this case may afford."); Sierra Pub. Co. v. NLRB, 889 F.2d 210, 216 (9th Cir. 1989) (the "reach" of Jefferson Standard's "'disloyalty' test . . . remains unclear"); Melinda J. Branscomb, Labor, Loyalty, and the Corporate Campaign, 73 B.U. L. Rev. 291, 306 (1993) ("Though the Court specified a number of objectionable aspects of the technicians' conduct, it articulated the weight and relevance of none. Like the Board, it declined to formulate a test for loss of protection . . . ." (footnote omitted)). The Board's decision in Jefferson Standard, which the Supreme Court affirmed, was explicit: It refused to "attempt[] to formulate a test which will decide every imaginable case involving similar questions as to the scope of Section 7." 94 N.L.R.B. at 1512. Nothing in the Supreme Court's opinion indicates that it intended to formulate a test where the Board declined to do so.

Jefferson Standard acknowledged that the "legal principle that . . . disloyalty is adequate cause for discharge is plain enough," but it left to the Board the "difficult[]" task of "determining whether, in fact, the discharges are made because of such a separable cause." 346 U.S. at 475. Read in its entirety, the opinion at best provides some potential factors that may guide the Board's analysis in "developing and applying national labor policy" and setting the boundaries of Section 7 protection. NLRB v. Curtin Matheson Sci., Inc., 494 U.S. 775, 786 (1990); City Disposal Sys., 465 U.S. at 829 ("We have often reaffirmed that the task of defining the scope of § 7 'is for the Board to perform in the first instance as it considers the wide variety of cases that come before it . . . .'" (quoting Eastex, 437 U.S. at 568)). Where the Supreme Court has not articulated a particular standard to follow, the Board acts within its discretion in formulating its own test and in assigning weight to the relevant factors. See Sierra Pub. Co., 889 F.2d at 218–19 ("The relative weight to be given each of these factors can be debated, but we conclude that the Board acted appropriately in considering them." (footnote omitted)). As discussed more fully below, the Board reasonably concluded that employee communications criticizing their employer's product do not lose the protection of Section 7 when (1) the "attack

related itself to [a] labor practice of the company," <u>Jefferson Standard</u>, 346 U.S. at 476, and (2) the employees responsible for the communications lack a "calculat[ing]" or "deliberate[]" motive to harm their employer, <u>id.</u> at 471.

## 1.

The court reads <u>Jefferson Standard</u> as stating that the technicians' handbills would constitute unprotected disloyalty regardless of whether their distribution was "a concerted activity wholly or partly within the scope of those mentioned in § 7." <u>Id.</u> at 477. According to the court, the Board "overruled" this portion of <u>Jefferson Standard</u> by protecting disloyal communications because they are "part of or related to an ongoing labor dispute." The test applied by the Board is much narrower than this, however, and is fully permissible under <u>Jefferson Standard</u>.

The Board did not look for a tangential connection or mere contemporaneousness with a labor dispute. Rather, in the first step of its analysis, the Board examined whether the communications themselves "indicate" that they are "expressly related to" or "directly linked to" an ongoing labor dispute. <u>MikLin</u>, 361 N.L.R.B. No. 27 at *3. The Board concluded that because they included the phrase "Help Jimmy John's Workers Win Sick Days," the posters and press release "clearly connected" the potential risk to the public of eating food prepared by sick employees to the central issue in the labor dispute. <u>Id.</u> The Board asked not merely whether the communications were part of or related to a protected activity, but whether the communications indicated *on their face* a connection to an ongoing labor dispute. This distinction is an important one. While <u>Jefferson Standard</u> arguably found that the former communications can be unprotected disloyalty, it at least left open and arguably suggests that the latter communications should be protected by Section 7.

"[C]oncerted activity" can be "wholly or partly within the scope of" protection under Section 7 without facially indicating a direct link to a labor dispute. <u>Jefferson</u>

-30-

Standard, 346 U.S. at 477; see, e.g., Eastex, 437 U.S. at 569–70 (holding that a newsletter that "urg[ed] employees to write their legislators to oppose incorporation of the state 'right-to-work' statute into a revised state constitution," "criticiz[ed] a Presidential veto of an increase in the federal minimum wage[,] and urg[ed] employees to register to vote" was protected concerted activity); see NLRB v. RELCO Locomotives, Inc., 734 F.3d 764, 785–86 (8th Cir. 2013) ("[A]ction which involves only a speaker and a listener can qualify as concerted action if it had *some relation* to group action in the interest of the employees." (emphasis added) (internal quotation omitted)). Jefferson Standard itself addressed such a communication. Unlike the poster and press release here, the handbills in Jefferson Standard "made no reference to the union, to a labor controversy or to collective bargaining." 346 U.S. at 468. Although the handbills were related to a "pending labor controversy," the Court found they were a "separable attack" from the pending dispute because they "related . . . to no labor practice," "made no reference to wages, hours or working conditions," and "omitted all reference to" and, in fact, "diverted attention from" the ongoing labor controversy. Id. at 476. The Court was not presented with a communication that was directly linked to a labor dispute on its face—and thus its holding cannot be binding here—but the reasoning offered by Jefferson Standard suggests that the absence of such a connection was crucial to its conclusion that the handbills were unprotected disloyalty.

Like Jefferson Standard, the Board draws a line between communications (like the handbills) that fall under Section 7 because they relate to or "coexist[]" with a labor dispute—which can lose protection due to disloyalty—and those (like the poster and press release) that fall under Section 7 because they directly attack a labor practice of the company—which Jefferson Standard suggests may not lose protection based on disloyalty. Id. The Board here found the communications were not disloyal in part because the poster and press release explicitly attacked the company's sick leave policy. MikLin, 361 N.L.R.B. No. 27 at *3. Its determination was based on a long-adhered-to rule, upheld by several courts, requiring that communications that

-31-

disparage an employer's product must directly reference a labor dispute in order to receive protection under Section 7. See Sierra Pub. Co., 889 F.2d at 217 & n.9 (holding that the Board's focus on the link between the union's letter and the labor dispute was "appropriate" because "[t]his feature was central to the Supreme Court's reasoning in Jefferson Standard"); Endicott, 453 F.3d at 537 (finding "the Board's formulation [of the two-part test] accurately reflects the holding in Jefferson Standard"); see, e.g., Five Star, 349 N.L.R.B. at 44 (refusing to extend Section 7 protection because "the content of their letters was not sufficiently related to the drivers' terms and conditions of employment," even though "they were written as part of the drivers' letter-writing campaign"); Am. Golf Corp., 330 N.L.R.B. at 1241 (concluding flyer was unprotected disloyalty even though it was circulated during other protected activities, because it "omitted all reference to the labor controversy and attacked policies of the Respondent with no discernible relation to it"). This portion of the Board's disloyalty standard accurately reflects the reasoning articulated in Jefferson Standard, and at the very least does not "overrule" it.

## 2.

The court also concludes that the Board overruled Jefferson Standard by requiring that an employee's disparaging communication evidence a malicious motive to harm the employer. But this requirement does not come from Jefferson Standard. While the Board acknowledges that the first element of its test—that the communication indicate its direct relation to the labor dispute—originates from Jefferson Standard, MikLin, 361 N.L.R.B. No. 27 at *7, it makes no similar assertion with regard to the motive element. In fact, the Board cites only NLRB decisions in support of this requirement. Id. at *5–6; see Veeder-Root Co., 237 N.L.R.B. 1175, 1176–77 (1978) (describing how the Board developed the maliciousness standard in an "attempt[] over the years to balance the right of employees to engage in concerted activities" under Section 7 and the employer's right under Section 10(c) "to maintain plant discipline and to bar inflammatory material from its premises"). Because the

-32-

Board's motive requirement comes from its own precedent and not from the Supreme Court, it is entitled to this court's deference. See Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 364 (1998) ("Courts must defer to the requirements imposed by the Board if they are rational and consistent with the Act." (internal quotation omitted)); Pub. Serv. Co. of N.M. v. NLRB, 843 F.3d 999, 1004 (D.C. Cir. 2016) (the Board's interpretation of its own precedent is entitled to deference).

The Board's reliance on motive is not an unreasonable interpretation of Section 7. Both the Supreme Court and our court have affirmed the centrality of motive in the disloyalty analysis. In NLRB v. Washington Aluminum Co., 370 U.S. 9 (1962), the Court rejected the argument that employees who had left their work in a machine shop without permission because it was too cold had lost Section 7 protection due to disloyalty. Id. at 17. The Court found their activities "cannot be classified as 'indefensible'" disloyalty because "concerted activities by employees for the purpose of trying to protect themselves from working conditions" they find intolerable are "unquestionably" protected by the Act. Id. Thus, the Court found Jefferson Standard's disloyalty principle did not apply where the employees' purpose was to improve working conditions.

We went even further in NLRB v. Red Top, Inc., 455 F.2d 721 (8th Cir. 1972), making clear that the Board must look at motive when determining whether to extend Section 7 protection to disparaging conduct. There, the Trial Examiner found that housekeeping employees were properly discharged because they engaged in a campaign to secure the removal of their manager, including by threatening to and making complaints to one of their employer's customers. Id. at 724. The Board reversed, but we agreed with the Trial Examiner, finding the conduct was "insulting, threatening, and disloyal," id. at 728, and stating:

> The Trial Examiner found that the committee was acting
> for improper and unprotected motives, that of causing

-33-

Lassiter to be replaced as manager. The Board does not dispute this. While not expressing it clearly, the Board seems to be acting on the theory that the motivation of the employees is not determinative of the issue of whether they were engaged in a protected activity. This is not the case. It is difficult to even imagine that Congress intended the National Labor Relations Act to protect employee conspiracies against an unpopular manager. Thus the question of whether or not the three employees pressed their alleged grievances in good faith becomes vitally important.

Id. at 725–26. These cases establish that motive is not only relevant to the disloyalty analysis, it is "vitally important." Id. at 726.[6]

The importance of motive in the disloyalty analysis is also consistent with Jefferson Standard. The Court approved of the Board's consideration of the fact that the technicians "*deliberately undertook* to alienate their employer's customers by impugning the technical quality of his product." 346 U.S. at 471 (emphasis added). Examining whether the employees deliberately used methods intended to harm the employer suggests the Court considered the employees' purpose or motive to be part of the disloyalty inquiry. See also Montefiore, 621 F.2d at 517 ("Underlying [Jefferson Standard] is the principle that while legally striking employees are generally entitled to enlist the consensual support of the public for their cause they

---

[6]The court cites St. Luke's Episcopal-Presbyterian Hospitals, Inc., 268 F.3d 575, for the proposition that "our cases confirm that an employee's disloyal statements can lose Section 7 protection without a showing of actual malice." But St. Luke's addresses only whether the employee's communications were unprotected because they were untrue. St. Luke's had nothing to say about an employee's disloyal statements; the term "disloyal" appears nowhere in its analysis.

may not . . . deliberately inflict on the employer economic harm unnecessary to the legitimate concerted activities.").[7]

Relying solely on <u>Jefferson Standard</u>, the court asserts that by requiring employees to evince a motive to harm their employer, the Board has "effectively removed" an inquiry into the indefensibility of the means used by the employees. The Board's decision here demonstrates that it did in fact examine the means used by the employees. The Board explained that the poster and press release were protected because they "did not use inflammatory language," their "message did not stray from the context of the labor dispute," and they "only suggest[ed] the realistic potential for illness." <u>MikLin</u>, 361 N.L.R.B. No. 27 at *7–8. It specifically examined the communications from an objective perspective, concluding that "any person viewing the posters and press release would reasonably understand that the motive for the communications was to garner support for the campaign to improve the employees' terms and conditions of employment by obtaining paid sick leave rather than to disparage [MikLin] or its product." <u>Id.</u> at *3. As the dissenting member explained, requiring a "disloyal malicious intent" does not subvert the Board's examination of the means used because motive need not be independently proven; instead, it "may be inferred from the circumstances of a particular protest." <u>Id.</u> at *12 (Johnson, M., dissenting in part); <u>see, e.g.</u>, <u>Five Star</u>, 349 N.L.R.B. at 46 ("[T]hese three drivers used inflammatory language—again, in the context of incidents not related to the drivers' group concerns—to describe the Respondent *in a manner that suggested that the drivers intended to damage* the Respondent's reputation." (emphasis added)). In my view, the Board's malicious motive requirement—which originated in the NLRB's own case law and is supported by several precedential court decisions—does not "effectively remove" or "overrule" <u>Jefferson Standard</u>'s disloyalty principle.

---

[7]The Board's decision to incorporate motive into its disloyalty analysis is also supported by the plain language of the term: "disloyalty . . . focus[es] on one's subjective state of mind." Branscomb, <u>supra</u>, 73 B.U. L. Rev. at 322 n.144, 331.

**B.**

When the Board adopts a standard that carries out its interpretation of the Act, its reasonable rule is entitled to "considerable deference." City Disposal Sys., 465 U.S. at 829; accord ABF Freight Sys., Inc. v. NLRB, 510 U.S. 317, 324 (1994). Yet the court affords no deference to the Board's formulation of its disloyalty test. It contends no deference is warranted because the Board was interpreting Jefferson Standard, not applying its own interpretation of the Act. As discussed above, however, the Board did not interpret Jefferson Standard when it added the malicious motive requirement. Thus, this explanation for de novo review at most pertains only to the Board's conclusion that the disloyalty exception applies where the communication directly references an ongoing labor dispute.

At least as to the malicious motive element, traditional Chevron deference applies.[8] See Hormel, 962 F.2d at 1065 (applying Chevron deference to the Board's subjective test for determining whether an employee's support of a boycott violated his duty of loyalty). In Brand X, 545 U.S. at 983, the Supreme Court stated that "a court's opinion as to the best reading of an ambiguous statute an agency is charged with administering is not authoritative . . . . Instead, the agency may . . . choose a different construction, since the agency remains the authoritative interpreter (within the limits of reason) of such statutes." Pursuant to Brand X, "[o]nly a judicial precedent holding that the statute unambiguously forecloses the agency's

---

[8]Even though the Board adopted the first element of its disloyalty test—the direct link—from Jefferson Standard, Brand X may apply. Nothing in Brand X limits its application based on the origin of the agency's test. See Branscomb, supra, 73 B.U. L. Rev. at 384 ("The Board has the power to reject the Jefferson Standard disloyalty test, and such a rejection would not amount to an impermissible attempt to 'overrule' a higher Court.").

-36-

interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction." Id. at 982–83.[9]

Applying Brand X here, it is evident that Jefferson Standard did not interpret Sections 7 or 10(c) to *unambiguously* foreclose the Board from considering whether the employee had malicious motive, nor did it *unambiguously* require the Board to look only at an employee's means to determine whether an employee demonstrated detrimental disloyalty. See id. at 985 ("Before a judicial construction of a statute . . . may trump an agency's, the court must hold that the statute unambiguously requires the court's construction."); Branscomb, supra, 73 B.U. L. Rev. at 384 ("[T]he Jefferson Standard Court did not declare that a disloyalty test is the *only* reasonable interpretation of the Act . . . ."). The Jefferson Standard Court relied on the Act's policy, not its plain language. See 346 U.S. at 472–74, 472 n.9. It made clear that its interpretation of the statute "leaves . . . room for agency discretion," Brand X, 545 U.S. at 982, to determine whether discharges are made because of disloyalty, see 346 U.S. at 475. Much like the Jefferson Standard Court, I do not believe that the "statute's plain terms directly addres[s]" whether the Board may require evidence of an employee's malicious motive to sustain the discharge of an employee for disloyalty. Brand X, 545 U.S. at 982 (alteration in original) (internal quotation omitted); see Hormel, 962 F.2d at 1065 ("Nothing in the text or the legislative history of the NLRA addresses the specific question of the test the Board should use to define the contours of an employee's duty of loyalty.").[10]

_____

[9]Courts have held that Brand X applies to judicial precedent from the Supreme Court. See, e.g., United States v. Home Concrete & Supply, LLC, 132 S. Ct. 1836, 1843 (2012) (plurality op.); Hernandez-Carrera v. Carlson, 547 F.3d 1237, 1247–28 (10th Cir. 2008); see also Sandoz Inc. v. Amgen Inc., — S. Ct. —, 2017 WL 2507337, at *16 (2017) (Breyer, J., concurring); Cuomo v. Clearing House Ass'n, L.L.C., 557 U.S. 519, 548 (2009) (Thomas J., dissenting).

[10]Although it is not entirely clear, the court does not appear to contest my conclusion that Jefferson Standard's disloyalty principle—to the extent it is

Because the statute is ambiguous on the question, "we defer . . . to the agency's interpretation so long as the construction is 'a reasonable policy choice for the agency to make.'" Brand X, 545 U.S. at 986 (quoting Chevron, 467 U.S. at 845); see Curtin Matheson Sci., 494 U.S. at 786 (holding that Board has "considerable deference" in determining the legal rule to apply and should be upheld "as long as it is rational and consistent with the Act"). It would be difficult to conclude that the Board made an unreasonable policy choice when, in Washington Aluminum and Red Top, the courts found the employees' motives determinative in the application of the disloyalty exception, and even Jefferson Standard relied on employee motive in its analysis. See Palmetto Prince George Operating, LLC v. NLRB, 841 F.3d 211, 216 (4th Cir. 2016) (applying Brand X and concluding that "the Board adopted a reasonable interpretation" of the Act where it "did nothing more than implement guidance offered directly by the Supreme Court").[11] I therefore conclude that the Board's requirement that there be evidence of the employees' malicious motive to reach a finding of disloyalty should be upheld because it is "a permissible construction of the statute." Minn. Licensed Practical Nurses Ass'n v. NLRB, 406 F.3d 1020, 1025 (8th Cir. 2005) (quoting Chevron, 467 U.S. at 843).

The court refuses to follow Brand X, asserting it "would leave the Board free to disregard any prior Supreme Court or court of appeals interpretation of the

---

definable—is merely one interpretation of the ambiguous language in Sections 7 and 10(c).

[11]I recognize that the Hormel court came to a different conclusion. 962 F.2d at 1065. Hormel, however, addressed the Board's standard for determining whether an employee "*support[ed]* the consumer boycott" of the employer's product, not the standard for determining whether such support is disloyal. Id. at 1064 (emphasis added). Here, by contrast, there is no dispute the employees supported the posters and press release, and we address only whether those tactics were disloyal.

NLRA."[12]   That is in fact what Brand X allows, at least when the Act is ambiguous and the Board's interpretation reasonable.  See Gutierrez-Brizuela v. Lynch, 834 F.3d 1142, 1143 (10th Cir. 2016) (Gorsuch, J.) ("[I]n recent years the Supreme Court has instructed us that, when a statute is ambiguous and an executive agency's interpretation is reasonable, the agency may indeed exercise delegated legislative authority to overrule a judicial precedent in favor of the agency's preferred interpretation.").  Because Jefferson Standard did not hold that Sections 7 and 10(c) unambiguously required a disloyalty test that excluded a requirement that there be evidence of the employees' malicious motive, the Board was free, within the limits of reasonableness, to construe the statutes to require such evidence.[13]

## C.

Furthermore, the court's definition of the "critical question" that the Board and courts must address in disloyalty cases unjustifiably limits the protections of the Act. It sets up a dichotomy in which communications "reasonably targeted at the employer's labor practices" are not disloyal, but those that "indefensibly disparage[] the quality of the employer's product or services" are disloyal.  But this dichotomy

---

[12]Brand X rejected the court's interpretation of the cases it cites, stating that the conclusion that *stare decisis* required an agency to follow the court's construction of a statute was based on a "mistaken reading" of the cases.  545 U.S. at 984 (citing Neal, 516 U.S. 284, Lechmere, 502 U.S. 527, and Maislin, 497 U.S. 116).  According to the Supreme Court, Neal, Lechmere, and Maislin "allow a court's prior interpretation of a statute to override an agency's interpretation only if the relevant court decision held the statute unambiguous."  Id.

[13]The court also asserts that Brand X does not apply where the Board is interpreting "a statute intended to limit the Board's authority."  Nothing in Brand X—or any other case—supports such a limitation.  In any event, "[t]here is no indication . . . that [Section 10(c)] was designed to curtail the Board's power in fashioning remedies when the loss of employment stems directly from an unfair labor practice."  Fibreboard, 379 U.S. at 217.

finds no support in the case law[14] or in any practical understanding of labor disputes. In many cases, including this one, employees' communications reflect a direct link between an employer's labor practice and the quality of the employer's product or service. See Diamond Walnut, 113 F.3d at 1278 (Wald, J. concurring in part and dissenting in part) ("[E]mployees often seek to demonstrate how their interests and those of the public coincide by arguing that labor disputes or poor working conditions are harming the employer's product."); see, e.g., Montefiore, 621 F.2d at 517 (striking doctors told patients "they would receive better medical care if they went to a 'full service, non-struck facility'"); St. Lukes, 268 F.3d at 578 (nurse accused the hospital of "jeopardizing the health of mothers and babies by offering her and her counterparts short shifts and more responsibilities"); Greyhound Lines, 660 F.2d at 355, 357 (bus drivers' "press release announcing the intent of employee drivers to strictly obey the speed limit" suggested that the "'slowdown' was in protest of the enumerated grievances"). Case in point, the Board here concluded, and the court appears to agree, that "the safety issue raised [in the posters and press release]—employees working while they are sick—was directly related to and in furtherance of the ongoing dispute over the Respondent's failure to provide paid sick leave." MikLin, 361 N.L.R.B. No. 27, at *7. By limiting the content of employees' communications to attacks on the employer's labor practices and barring most product disparagement, the court "deprive[s] employees of what may be their most cogent argument for obtaining the third party's aid," Diamond Walnut, 113 F.3d at 1279 (Wald, J.,

---

[14]In support of this distinction, the court cites Diamond Walnut, where striking union workers distributed leaflets that "described Diamond's workforce as composed of 'scabs' who packaged walnuts contaminated with 'mold, dirt, oil, worms and debris.'" 113 F.3d at 1261. But the Diamond Walnut court never addressed whether this activity was protected under Section 7 or would constitute cause for discharge under Section 10(c) because the petitioner never challenged these conclusions. Id. at 1267. Instead, the court addressed whether the employer had a substantial business justification for refusing to replace returning strikers in their selected jobs. Id. at 1263. To the extent the Diamond Walnut court addressed disloyalty, it did so only in dicta. See id. at 1267 n.8.

concurring in part and dissenting in part) (internal quotation omitted), "dampen[s] the ardor of labor debate[,] and truncate[s] the free discussion envisioned by the Act," Linn, 383 U.S. at 64. See Sierra Pub. Co., 889 F.2d at 217 ("If unions are not permitted to address matters that are of direct interest to third parties in addition to complaining about their own working conditions, it is unlikely that workers' undisputed right to make third party appeals in pursuit of better working conditions would be anything but an empty provision."); Red Top, 455 F.2d at 728 ("[H]arsh and rough words may be exchanged between the parties without giving rise to a basis for discharge consistent with the protections afforded under § 7 of the Act."). It is not for this court to say that public communications targeting the employer's labor practices "further the policy of the NLRA," while those attacking product quality do not. "Delineat[ing] precisely the boundaries" between protected and unprotected communications should be left to the Board. Eastex, 437 U.S. at 568.

## D.

In its merits analysis, the court criticizes the Board for requiring evidence of employees' malicious motive, but the court's merits analysis proves how crucial motive is to a disloyalty determination. The court looks to several aspects of the employees' intent: that they "cho[se] March as a 'good time' to launch" their campaign, they "understood" the importance of MikLin's "'clean' public image" and yet directly attacked it, and they engaged in a "calculated, devastating" attack on MikLin's product. As the court admits, the "[e]mployees' conscious decision to scare

MikLin customers . . . was strong evidence of their intent to disparage MikLin . . . ."[15]

In any event, according the appropriate deference to the disloyalty standard applied by the Board, I cannot say that the Board erred in finding that the poster and the press release fell short of unprotected disloyalty. Considering both the employees' subjective intent and the reasonableness of the means used, the Board found that the communications were directly tied to the dispute over MikLin's sick-leave policy, and the employees questioned the health of the product in an effort to solicit the public's support to change that policy. The communications described the quality of MikLin's product only in terms of how it was affected by the lack of paid sick leave. The posters targeted an audience within a two-block radius of a MikLin store and identified the person the audience should contact to show support. The language used was not inflammatory, or intended to degrade or humiliate. Nonetheless, reasonable minds could, and did, differ as to whether the means used by the employees crossed the line from protected concerted activity into unprotected "detrimental disloyalty." Jefferson Standard, 346 U.S. at 472. Because I perceive this as a "choice between two fairly conflicting views," I believe we must affirm the Board's decision. Midwest Precision Heating & Cooling, Inc. v. NLRB, 408 F.3d 450, 458 (8th Cir. 2005) (quotation omitted). Accordingly, I would defer to the Board's finding that the Sandwich Poster campaign communications were not so disloyal as to lose protection under the Act.

---

[15] Similarly, while the court expressly limits its legal analysis to the disloyalty exception, its merits analysis relies heavily on an unaddressed basis for losing the Act's protection: its conclusion that the communications were maliciously untrue. Reasonable minds could conclude that alleged falsities in the poster and press release gave MikLin cause to discharge the employees, but such a conclusion does not rest on the court's definition of disloyalty. See Five Star, 349 N.L.R.B. at 46 (in evaluating disloyalty, "[i]t matters not whether the communications were true or false").

-42-

**E.**

Because I conclude that the posters were protected activity, I would accordingly find, deferring to the factual conclusions of the Board, that MikLin co-owner Robert Mulligan's Facebook posting, which solicited employees to remove the posters, violated Section 8(a)(1).

_____

## Appendix A

